**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

| | |
|---|---|
| GET LOUD ARKANSAS; VOTE.ORG; NIKKI PASTOR; and TRINITY "BLAKE" LOPER, | Civil Action |
| Plaintiffs, | Case No. 5:24-cv-05121-TLB |
| *v.* | |
| JOHN THURSTON; SHARON BROOKS; JAMIE CLEMMER; BILENDA HARRIS-RITTER; WILLIAM LUTHER; JAMES HARMON SMITH, III; and JOHNATHAN WILLIAMS, in their official capacities as Commissioners of the Arkansas State Board of Election Commissioners; BETSY HARRELL, in her official capacity as Benton County Clerk; BECKY LEWALLEN, in her official capacity as Washington County Clerk; and TERRI HOLLINGSWORTH, in her official capacity as Pulaski County Clerk, | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| Defendants. | |

## INTRODUCTION

1.      Get Loud Arkansas, a nonprofit organization dedicated to providing easily accessible means for all Arkansans to register to vote—with a focus on young and minority citizens in particular—created an online tool on its website that allowed prospective voters to complete a voter registration application using a computer or mobile device. Through GLA's streamlined process, voters filled out the applications digitally, rather than by hand; signed the forms electronically, rather than with pen and ink; and authorized GLA to print and submit the completed application to county clerks. Arkansas's election officials even assured GLA that this online process was lawful. Indeed, the use of an electronic signature on a voter registration application

was so uncontroversial in Arkansas that the Secretary of State's office stated on multiple occasions that an electronic signature should not be treated any differently than a wet signature, and the Attorney General confirmed this in a formal opinion.

2.      But once media outlets began reporting on GLA's success in registering hundreds of young and minority voters, the Secretary abruptly reversed himself and recommended for the first time that counties reject electronic signatures on voter registration applications. The State Board of Election Commissioners followed suit, ignoring the Attorney General's opinion and issuing an emergency rule prohibiting electronic signatures. To make matters worse, Arkansas officials have refused to clarify whether registered voters who previously used an electronic signature to register will have their registrations canceled, despite repeated requests from GLA, leaving many currently-registered Arkansas voters in limbo.

3.      Although the wet signature rule is a new invention in Arkansas, it bears a striking resemblance to the suppressive tactics that spurred Congress to enact the materiality provision in its landmark Civil Rights Act of 1964.[1] The provision seeks to eliminate opportunities for arbitrary, discriminatory practices "in the registration of voters for Federal elections . . . by prohibiting the disqualification of an individual because of immaterial errors or omissions in papers or acts" requisite to voting. H.R. Rep. No. 88-914 (1963), *as reprinted in* 1964 U.S.C.C.A.N. 2391, 2394. As demonstrated by the legislative record, Congress had good reason to be concerned about such disenfranchisement, especially as it related to voter registration applications. Extensive testimony showed that many local registrars rejected Black applicants based on hyper-technical or entirely invented errors, while they ignored more substantive errors when the applicants were white.

---

[1] The phrase "wet signature rule" refers to the State Board of Election Commissioners' emergency rule, and any other regulations or procedures that county clerks have applied to reject applications with electronic or digital signatures.

4.      These practices resulted in disparate voting opportunities for minority voters in many states, including Arkansas. In 1961, for example, the U.S. Commission on Civil Rights observed that Black Arkansans remained disproportionately unregistered to vote compared to white Arkansans. *See* Book 1, U.S. Comm'n on Civ. R., *Voting: 1961 Commission on Civil Rights Report* 105 (1961). As arbitrary barriers continued to disenfranchise voters—and especially minority citizens—Congress determined that national legislation was necessary to prevent states from devising creative methods to deny individuals the right to vote.

5.      Yet more than half a century later, the legacy of past discrimination endures. Arkansas has the lowest voter registration rate in the country at only 62 percent, with young and minority voters registered at even lower rates. And its election officials continue to reject new applications, including from Plaintiffs Nikki Pastor and Blake Loper, simply because they signed their applications with the "wrong" instrument—a meaningless technicality that creates unlawful barriers to the franchise and obstructs the efforts of civic organizations like Plaintiffs GLA and Vote.org that use innovative technology to promote civic engagement.

6.      Simply put, Arkansas has erected an arbitrary restriction that is irrelevant in determining voter qualifications but denies eligible citizens the right to vote. This Court should enforce the guarantees of the Civil Rights Act and enjoin the enforcement of Arkansas's wet signature rule.

## JURISDICTION & VENUE

7.      Plaintiffs bring this action under 42 U.S.C. §§ 1983, 1988, as well as 52 U.S.C. § 10101, to redress the deprivation under color of state law of rights secured by the laws of the United States. This Court has original jurisdiction over the subject matter of this action, pursuant to 28 U.S.C. §§ 1331, 1343, because the matters in controversy arise under the laws of the United

States and involve the assertion of a deprivation, under color of state law, of a right under the laws of the United States.

8.     This Court has the authority to enter declaratory relief, pursuant to 28 U.S.C. §§ 2201, 2202, and authority to enter injunctive relief pursuant to Fed. R. Civ. P. 65.

9.     This Court has personal jurisdiction over the Defendants, who are sued in their official capacities and reside within this State.

10.     Venue is proper in the United States District Court for the Western District of Arkansas because at least one of the Plaintiffs resides within this District and a substantial part of the events that give rise to Plaintiffs' claims have occurred and will occur in this District. 28 U.S.C. § 1391(b)(2). Defendants, who are sued in their official capacities, include statewide officials whose conduct and duties cover the entire State of Arkansas, as well as county officials who reside in and have their offices in this district. *Id.* § 1391(b)(1).

## PARTIES

11.     Plaintiff GET LOUD ARKANSAS ("GLA") is an Arkansas nonprofit corporation, founded in 2021, after Census data revealed that Arkansas had the lowest rate of registered voters and one of the lowest voter turnout rates in the nation, particularly among young and minority residents. To increase civic participation in Arkansas, GLA works to register new voters, engage low propensity voters, and mobilize all eligible citizens to utilize the power of their vote to shape the future of Arkansas. GLA's website directs voters to tools that allow them to verify their voter registration status, find their polling place, and submit a voter registration application.

12.     Since its founding, GLA has invested significant resources in developing the most effective means of increasing voter participation in Arkansas, especially among young and minority voters, who have historically faced disproportionate barriers to voter participation. GLA learned through its work that disseminating and tracking paper registration applications, along with

educational resources to help voters properly return those applications, is often a time-consuming and cumbersome process to register large numbers of voters, and in particular younger voters. GLA also learned that many Arkansans, especially those in rural areas, do not have easy access to materials necessary to print and submit paper applications. Accordingly, GLA focused its efforts on developing online tools to make voter registration less burdensome for Arkansans. After piloting an online registration portal on its website in 2023, GLA officially launched its online voter registration tool in early 2024, which allowed users to complete *and sign* voter registration applications electronically. The tool was immediately successful and helped hundreds of Arkansans to fill out voter registration applications using a computer, phone, or tablet.

13.     To ensure that electronically signed voter registration applications were valid, GLA consulted the Secretary of State's office and received assurances that they were. Soon after the success of GLA's program became public and its constituents began to register in greater numbers, however, state election officials soured on GLA's online tool. The Secretary instructed county officials that any application signed digitally should not be accepted, and county officials obliged; shortly after, the SBEC enacted an emergency rule requiring wet signatures on voter registration applications.

14.     As a result of the SBEC's wet signature rule, GLA's voter registration efforts have been severely inhibited. It was forced to disable its online tool and now must rely on less efficient and more expensive methods to register voters across Arkansas: traditional voter registration campaigns involving hard-copy applications, face-to-face interactions between staff and potential applicants, and frequent encouragement and reminders for potential applicants. That, in turn, has forced GLA to divert time and money away from other activities crucial to its mission—such as initiatives focused on encouraging citizen involvement in local government, monitoring changes

in local election law, and assisting those purged from voter rolls reestablish their registration, as well as get-out-the vote campaigns.

15.     Plaintiff VOTE.ORG ("VDO") is the largest 501(c)(3) nonprofit, nonpartisan voter registration and get-out-the-vote technology platform in the county. VDO uses technology to simplify political engagement, increase voter turnout, and strengthen American democracy. VDO works extensively to support low-propensity voters, including racial and ethnic minorities and younger voters, who tend to have lower voter-turnout rates. In 2022 alone, VDO helped register more than 725,000 voters nationwide.

16.     Between 2018 and 2022, VDO helped more than 80,000 Arkansans register to vote by providing a tool that allowed voters to fill in prompts on VDO's website that would populate the information onto a voter registration application provided by the State. The applicant could then print, sign, and send that application to the appropriate county clerk.

17.     Nationwide, one of VDO's most effective tools is the e-signature function of its voter registration web application. The e-signature function allows qualified voters in states across the country to digitally enter information into a voter registration application, sign the application by uploading an image of their original signature, review their signed voter registration application, and have the completed application sent to the appropriate registration official. VDO has invested significant resources in developing the e-signature function and would like to offer it to Arkansas citizens, just as it has done in several other states. Although VDO has the capability and desire to deploy this tool in Arkansas, it cannot do so in the upcoming election because of the wet signature rule. Unable to use the e-signature function in Arkansas, VDO will be forced to print and mail physical copies of the application to each user that completes a voter registration application on VDO's web platform, which is a much less effective means of registering voters. Operating this

print and mail program also requires significantly more resources, including time and costs for printing and postage, whereas the e-signature tool would eliminate the need to send paperwork to voters. And it requires VDO to reallocate resources from other engagement efforts around the country, including absentee ballot assistance programs and get-out-the-vote projects.

18.     Plaintiff NIKKI PASTOR is a U.S. citizen, at least eighteen years of age, and a resident of Fayetteville, Arkansas, in Washington County. Pastor attempted to register to vote using GLA's online tool and used an electronic signature to complete her voter registration application. That application was rejected as a result of Defendants' enforcement of the wet signature rule, and Pastor remains unregistered to vote in Arkansas.

19.     Plaintiff TRINITY "BLAKE" LOPER is a U.S. citizen, at least eighteen years of age, and a resident of Russellville, Arkansas, in Pope County. Loper attempted to register to vote using GLA's online tool and used an electronic signature to complete their voter registration application. That application was rejected as a result of Defendants' enforcement of the wet signature rule, and Loper remains unregistered to vote in Arkansas.

20.     Defendants JOHN THURSTON,[2] SHARON BROOKS, JAMIE CLEMMER, BILENDA HARRIS-RITTER, WILLIAM LUTHER, JAMES HARMON SMITH, III, and JOHNATHAN WILLIAMS serve as Commissioners of the State Board of Election Commissioners ("SBEC") and are sued in their official capacities only. The SBEC has authority to make rules and regulations "to secure uniform and efficient procedures in the administration of" Arkansas's voter registration laws "throughout the State." Ark. Const. amend. 51, § 5(e)(1). The SBEC also creates "detailed specifications of the registration record files, [and] the voter

---

[2] Defendant Thurston serves as the Arkansas Secretary of State and as *ex officio* chairman and secretary of the SBEC. Ark. Code Ann. § 7-4-101(b). He is sued in his official capacity on the SBEC.

registration application forms, . . . all of which shall be consistent with [the constitutional provisions governing voter registration] and uniform throughout the State." *Id.* § 5(e)(3). The SBEC has authority to "promulgate all necessary rules to assure even and consistent application of voter registration laws." Ark. Code § 7-4-101(f)(5). Additionally, the SBEC is authorized to conduct training for election officials, as well as to "[i]nvestigate alleged violations, render findings, and impose disciplinary action . . . for violations of election and voter registration laws." *Id.* § 7-4-101(f)(2), (9).

21.     Defendants BETSY HARRELL, BECKY LEWALLEN, and TERRI HOLLINGSWORTH serve as the County Clerks for Benton County, Washington County, and Pulaski County, respectively, and are sued in their official capacities. Each county in Arkansas has a county clerk, who serves as the "Permanent Registrar" of that county. Ark. Const. amend. 51, § 2(b). County clerks have authority to register qualified applicants to vote. *See id.* §§ 5(a), 6(a)(8), 9(c)–(h). Each county clerk "shall register qualified applicants when a legible and complete voter registration application is received and acknowledged by the permanent registrar." *Id.* § 9(c)(1); *see id.* § 9(c)(3).

### GENERAL ALLEGATIONS

### I.     Registering to vote in Arkansas.

22.     The Arkansas Constitution sets forth the qualifications a person must satisfy to vote in Arkansas. It provides that any person may vote in an election if they are: (1) a United States citizen; (2) a resident of Arkansas; (3) at least eighteen 18 years of age; and (4) lawfully registered to vote in the election. Ark. Const. art. 3, § 1; *see also Martin v. Haas*, 556 S.W.3d 509, 512 (Ark. 2018). Absent constitutional amendment, state and county election officials may not "impose[] a requirement that falls outside the ambit of article 3, section 1, of the Arkansas Constitution." *Martin v. Kohls*, 444 S.W.3d 844, 852–53 (Ark. 2014).

23.     The voter registration process in Arkansas is governed by Amendment 51 to the Arkansas Constitution. *See id.* at 850. Amendment 51 provides "a comprehensive regulatory scheme governing the registration of voters," *Haas*, 556 S.W.3d at 516, in order "to establish a system of permanent personal registration as a means of determining that all who cast ballots in general, special and primary elections in this State are legally qualified to vote in such elections," Ark. Const. amend. 51, § 1.

24.     Under Amendment 51, a person may register to vote in several ways. First, they may submit a voter registration application created by the Secretary of State to their respective county clerk in person or by mail. *See* Ark. Const. amend. 51, §§ 6(a), 9(c)(1). Arkansas law permits third-party organizations to submit a voter registration application on the voter's behalf. *E.g.*, *id.* § 6(a)(2)(G).

25.     A person may also register to vote at a voter registration agency. *See id.* § 5(a). Voter registration agencies include (1) the Office of Driver Services ("ODS"); (2) public assistance agencies; (3) disabilities agencies; (4) public libraries; and (5) the Arkansas National Guard. *Id.* Voter registration agencies may use a "computer process" to register applicants or alternatively use the same voter registration applications created by the Secretary of State. *Id.* § 5(b)(1)–(4).

26.     Amendment 51 prescribes the "information . . . required of the applicant" to register to vote. *See generally id.* § 6. Among other requirements, the applicant must provide a "signature or mark made under penalty of perjury that the applicant meets each requirement for voter registration." *Id.* § 6(a)(3)(F). Amendment 51 does not state that a signature or mark must be made using a specific method or made with any specific type of ink. *See id.* § 6(b)(1). Applicants who register at a voter registration agency often use electronic signatures to satisfy this same requirement.

27.     Once a county clerk receives a voter registration application, the clerk "shall register qualified applicants" if the application is "legible and complete." *Id.* § 9(c)(1); *see also id.* § 9(c)(3).

## II.     Arkansas's low rates of voter registration and participation.

28.     The 2020 United States Census revealed that Arkansas has the lowest voter registration rate in the country at 62 percent. The 2020 Census also showed that young and Black Arkansans are registered to vote at lower rates than their older and white counterparts. Ahead of the 2020 presidential election, 55.3 percent of Black citizens in Arkansas were registered to vote, compared to 63 percent of white Arkansans. And only 48.7 percent of 18- to 24-year-old citizens were registered to vote, compared to 65.7 percent of those aged 45 to 64 and 67.7 percent of those older than 65.

29.     These trends have persisted. A report released in December 2023 found that Arkansas continues to have the lowest voter registration rate of any U.S. state, and registration rates are particularly low among Black Arkansans and younger people.[3]

30.     That same report also found that "Arkansas has consistently ranked below the national average in voter turnout,"[4] meaning Arkansas lags the nation not just in voter registration rates, but also in actual voter participation in elections once they are registered. For example, an analysis of the 2020 general election—which saw record voter turnout across the country—showed that Arkansas had the third lowest voter turnout rate of any state at 56.1 percent, compared to a

---

[3] Chul Hyun Park, et al., *2023 Arkansas Civic Health Index*, Nat'l Conf. on Citizenship, 5 (Dec. 4, 2023), https://ncoc.org/wp-content/uploads/2024/04/Arkansas-CHI-FINAL-4.1.2024.pdf.

[4] *Id.* at 7.

national turnout rate of roughly 67 percent.[5] Similarly, during the 2016 general election, Arkansas's turnout rate was 53.2 percent—the fourth lowest in the nation that election.[6]

### III.   GLA develops a successful online tool to help Arkansans register to vote.

31.    In 2021, in response to Arkansas's woeful voter registration and election participation rates, then-State Senator Joyce Elliott founded GLA with the express mission of improving civic participation in Arkansas, first and foremost through the registration of new voters.

32.    GLA has launched several initiatives in pursuit of its broad mission to promote civic engagement in Arkansas. For example, it has implemented get-out-the-vote campaigns in the lead-up to recent elections, including by organizing volunteers to engage in text banking to voters and by investing in advertisements to encourage voting among younger voters. GLA has also developed a program to identify and assist voters who are periodically purged from Arkansas's voting lists, a labor-intensive effort that requires GLA staff and volunteers to make repeated contacts with such voters to ensure they are re-registered.

33.    To encourage deeper civic engagement, GLA launched a campaign to raise awareness of and promote citizen involvement in local government, including by publishing and promoting information to educate people across the state about local elections and hearings. And GLA has started building voter protection teams to monitor and document changes to local election rules, including last minute changes to polling locations, which are often passed without widespread public awareness.

---

[5] *2020g: 2020 November General Election Turnout Rates*, U.S. Elections Project, https://www.electproject.org/2020g (Dec. 7, 2020).

[6] *2016 General Election, 2016 November General Election Turnout Rates*, U.S. Elections Project, https://www.electproject.org/2016g (Sept. 5, 2018).

34.     While all of these initiatives are critical to GLA's mission to promote civic engagement in Arkansas, registering new voters is the organization's highest priority. Accordingly, over the past year, GLA's primary focus has been to create accessible tools that make it easier for Arkansans, and particularly young and minority Arkansans, to register to vote.

35.     To that end, GLA committed significant resources—including staff time and financial resources—towards creating an online tool that allowed applicants to fill out the voter registration application created by the Secretary of State using a computer, phone, or tablet. Once functional, the tool allowed applicants to authorize GLA to print the completed application and submit it to the relevant county clerk on the applicant's behalf.

36.     To use the online tool, an applicant would go to GLA's website and click on the tab titled "Register to Vote." The applicant was then prompted to fill in information on two website pages that populate the Secretary of State's form, including all the information required by Amendment 51 § 6. The applicant was then required to use their finger, stylus, or mouse to sign their name above the identical "penalty of perjury" language used on the form issued by the Secretary of State. This information, and the signature, was then entered into the Secretary of State's form, which the applicant was able to review and save before authorizing GLA to print and submit it to the applicant's county clerk.

37.     GLA piloted a version of its online tool in January 2023 without the option for applicants to sign electronically. Using this version, an applicant completed the application online; GLA printed or mailed them a copy of the completed application; the applicant hand-signed the application; and then either the applicant or GLA returned the application to the appropriate county clerk. Although it was more successful than disseminating blank paper applications, GLA found that printing, signing, and mailing the application back to a county clerk continued to impose

12

barriers for most voters. GLA therefore developed a new version of the tool that would allow voters to complete and *sign* their applications through GLA's website, which GLA would subsequently print and submit to the appropriate county clerk.

38.     GLA developed this online tool and officially launched it in January 2024 with widespread success in helping Arkansans register to vote. The organization's efforts caught public attention, and an article in the Arkansas Times, published on February 26, 2024, further highlighted GLA's success registering hundreds of new voters.[7] The article reported that 358 people had already used the tool to register to vote in the early months of 2024, and that 78 percent of the new registrants were under 20 years old.

39.     The tool not only helped people apply to register to vote, but also made GLA's own outreach efforts more effective. By allowing applicants to complete the Secretary of State's voter registration application on a personal device, GLA was able to engage with a far greater numbers of potential applicants at community events, schools, and other areas where it seeks to register people. GLA staff and volunteers found it far easier to instruct large groups of applicants at schools or public events on how to complete the registration application on their phones or laptops versus having to distribute clipboards and paper applications. It also resulted in much more legible applications than those filled out in handwriting. And it was easier for GLA to table at outdoor events, where inclement weather sometimes made it impossible for people to complete paper applications. GLA found that people completed the application more quickly on their personal devices, meaning people with limited amounts of time were far more likely to complete the application electronically than on paper.

---

[7] *See* Mary Hennigan, *Get Loud Arkansas sees success in new voter registration strategy*, Ark. Times (Feb. 26, 2024), https://arktimes.com/news/2024/02/26/get-loud-arkansas-sees-success-in-new-voter-registration-strategy.

40.     GLA found it was easier to disseminate the application electronically using QR codes and text messages. Many people who registered through GLA's online tool forwarded the link to friends and families, which cannot be done with paper applications. GLA's online tool also made it easier to remind people to complete the applications, and it allowed GLA to track applicants and ensure they were successfully entered on the state's voter rolls—a far more cumbersome and less accurate process when using paper applications.

41.     In the short time the online tool was available, GLA saw significantly higher rates of successful voter registration.

**IV.     The Secretary of State confirms that GLA's online tool complies with Arkansas law.**

42.     GLA believed its online voter registration tool complied with Arkansas law because Amendment 51, on its face, does not require an applicant's *wet* signature to complete the voter registration application. Moreover, many Arkansans register to vote with electronic signatures at voter registration agencies. And electronic signatures are now a common feature of modern life used for all manner of transactions, from executing large commercial contracts to signing a credit card receipt for a cup of coffee.

43.     Nonetheless, out of an abundance of caution, Senator Elliott, GLA's Executive Director, emailed the Secretary of State's office on February 5, 2024, asking the office to confirm GLA's understanding that there was no wet signature requirement for voter registration applications.

44.     On February 5, the Secretary of State's office responded, "our attorneys looked into this last week and came to the same conclusion [as GLA] about the wet signature."

45.     Later the same day, GLA's Deputy Director followed up with the Secretary of State's office and explained that, when applying to register to vote with GLA's help, applicants sometimes sign the touchscreen with a stylus and sometimes with their finger. She then asked: "So

just to make sure I'm understanding correctly – the registrations we submit right now are not going to be rejected based on the signature . . . . Is that correct?"

46.     The Secretary of State's office replied that, while it could not "officially speak on the acceptance or rejection of applications" because the "authority lies solely with the county clerk's office," its "unofficial, non-attorney, advice to the county clerks would be to err on the side of the voter and accept the registrations."

47.     On February 12, 2024, GLA's Deputy Director again wrote to the Secretary of State's office and asked, among other questions: "For registration purposes, should digital signatures be treated differently than 'wet' signatures?"

48.     On February 14, 2024, the Secretary of State's office, after indicating that it was a "sensitive issue," stated: "[T]he Secretary of State does not see how a digital signature should be treated any differently than a wet signature." Accordingly, the Secretary's office assured GLA that its online tool complied with Arkansas law on no fewer than three occasions during their correspondence in early February 2024.

**V.     The Secretary of State reverses course and advises county clerks to reject applications with electronic signatures.**

49.     Despite the assurances given to GLA that electronically signed voter registration applications should be accepted, the Secretary of State abruptly reversed his position mere weeks later.

50.     On February 28, 2024, two days after the Arkansas Times reported on GLA's success registering new voters with its online tool, the Secretary wrote a letter to all county clerks, stating: "It has come to my attention that there have been some entities registering citizens to vote

by electronic applications and signature. . . . I strongly recommend that counties do not accept voter registration applications executed by electronic signature."[8]

51.     The Secretary's brief, two-paragraph letter provided no explanation or legal basis for his sudden shift in position. Moreover, the Secretary issued this letter without any warning to GLA, despite the aforementioned correspondence with the Secretary's office about this precise issue.

52.     On March 8, 2024, Lindsey French, an attorney for the Association of Arkansas Counties, emailed all county clerks and advised them, based on the Secretary of State's letter, "that current efforts to register voters electronically run afoul of the law." Ms. French advised the county clerks to follow the recommendation of the Secretary of State but also to "consult with your county attorney in making these determinations."

53.     After the Secretary of State's letter and Ms. French's email, many county clerks began to reject applications submitted with electronic signatures, while others continued to accept such applications.

54.     On March 12, 2024, after having already advised county clerks to reject applications with electronic signatures, the Secretary of State asked the Attorney General for an opinion on the lawfulness of such signatures. The Secretary wrote:

> My office has received inquiries regarding the use of electronic voter registration applications, created by a third-party non-governmental agency, that include an electronic signature. These applications are then either printed out and turned in or sent electronically to county clerks. I'm asking for a formal opinion from your office as to whether this practice is allowed under Arkansas law.

---

[8] *See* Austin Gelder, *Secretary of state warns against voter registration e-signatures; Pulaski clerk says she'll keep taking them*, Ark. Times (Mar. 7, 2024), https://arktimes.com/arkansas-blog/2024/03/07/mixed-messages-from-the-arkansas-secretary-of-state-sow-confusion-over-online-voter-applications.

55.     On April 10, 2024, the Attorney General issued opinion stating that "an electronic signature or mark is generally valid under Arkansas law" and that:

> Consequently, given the historical acceptance of signatures produced through a variety of means, the widespread acceptance of electronic signatures, and the fact that Amendment 51 does not contain any restrictions on how a "signature or mark" may be made, I believe that an electronic signature satisfies Amendment 51's "signature or mark" requirement.

Ark. Att'y Gen. Op. No. 2024-049 at 3 (Apr. 10, 2024).[9] In other words, the Attorney General's opinion confirmed the Secretary's initial position that electronic signatures satisfy Amendment 51.

56.     After the Attorney General issued his opinion, the Arkansas Democrat-Gazette reported that the SBEC—which the Secretary of State chairs—asked its staff to prepare an emergency rule addressing this issue.

57.     On April 23, 2024, the SBEC adopted an emergency rule prohibiting county clerks from accepting voter registration applications signed with an electronic signature.

58.     The wet signature rule bans electronic signatures on voter registration applications in three ways. First, it grafts non-textual language onto the term "signature or mark" in Amendment 51, redefining it to mean "a handwritten wet signature or handwritten wet mark made on a Registration Application Form with a pen or other writing device that is physically moved across the form and that forms the applicant's signature mark on the paper form."

59.     Second, the wet signature rule provides that "[a] Signature or Mark that utilizes a computer to generate the applicant's signature or mark is not an acceptable signature or mark of the applicant for purposes of" Amendment 51, even though Amendment 51 imposes no such prohibition.

---

[9] Available at: https://ag-opinions.s3.amazonaws.com/uploads/2024-049.pdf.

60.     Third, while Amendment 51 requires county clerks to accept voter registration applications that are "legible and complete," *see* § 9(c)(1), (c)(3)(A), the wet signature rule adds that voter registration applications must also be "executed with a Signature or Mark" as defined by the rule.

61.     On May 2, 2024, the Arkansas Legislative Council's Executive Subcommittee approved the emergency rule, which took effect on May 4 and remains in place until September 1, 2024, at which point it will expire unless it is re-issued as a final rule.

## VI.     Qualified Arkansas voters, including Plaintiffs Nikki Pastor and Blake Loper, have had their voter registration applications rejected due to the wet signature rule.

62.     In the wake of the wet signature rule's adoption, many otherwise qualified Arkansans have had their voter registration applications rejected because they signed the applications with an electronic signature. Such rejected applicants include Plaintiffs Nikki Pastor and Blake Loper.

63.     Nikki Pastor grew up in Clinton, Arkansas. She is a U.S. citizen and at least eighteen years of age. She has been a resident of Washington County, Arkansas since August 2023, before which she was a student in Missouri. She has never been convicted of a felony or adjudged as incompetent to vote by any court.

64.     On February 24, 2024, Pastor attended the Black Owned Northwest Arkansas Business Expo in Fayetteville, at which GLA was conducting its voter registration work. Pastor learned about GLA's online tool, scanned the QR code provided by GLA, and saved the link to the tool on her phone, intending to register when she got home. Using the link saved on her phone, Pastor was able to return to the tool and complete a registration application later that day. Pastor gave GLA approval to print the application and submit it to the Washington County Clerk, which GLA did.

65.     Pastor's application was rejected by the Washington County Clerk for its use of an electronic signature. Consequently, Pastor remains unregistered to vote despite having submitted an otherwise complete voter registration application to the Washington County Clerk.

66.     Blake Loper is a U.S. citizen, is at least eighteen years of age, and has never been convicted of a felony or adjudged as incompetent to vote by any court. Loper grew up in Dardanelle, Arkansas, in Yell County, but has been a resident of Russellville, in Pope County, since November 2022.

67.     Because they were previously registered in Yell County, Loper used GLA's online voter registration tool to complete and sign electronically a voter registration application for Pope County. Loper gave GLA approval to print and submit the application to the Pope County Clerk, which GLA did.

68.     A staff member of GLA had shared the link to the online tool, which Loper found to be a convenient way to update their voter registration to their new address in Pope County. In fact, Loper shared the link with several friends, thinking they would find it helpful and convenient too.

69.     GLA submitted Loper's application on December 11, 2023, but Loper did not receive any confirmation that their registration status had been updated. Accordingly, GLA resubmitted a carbon copy of the application on Loper's behalf several months later. On May 2, 2024, Loper received notice that the application was rejected by the Pope County Clerk for its use of an electronic signature.

70.     Loper remains unregistered to vote despite having submitted an otherwise complete voter registration application to the Pope County Clerk.

71.     GLA is aware that many other users of its online tool have had their voter registration applications rejected due to the wet signature rule. For example, GLA staff and volunteers visited Camden Fairview High School in Camden, Arkansas in February 2024—before the announcement of the SBEC's emergency rule—to help register high school students. GLA collected dozens of voter registration applications through its online tool and delivered them to the county clerk. However, GLA was soon notified that none of the applications would be accepted because they were signed with electronic signatures.

72.     Likewise, after announcement of the wet signature rule, GLA became concerned that applicants who previously submitted applications using an electronic signature may be at risk of having their registrations voided. The SBEC has stated that it believes it has the power to re-review previously accepted voter registration applications. Despite repeated attempts to seek guidance and clarity from the Secretary of State's office on this specific issue, GLA has not received any response to its inquiries. Consequently, hundreds of voters appear at risk of having their registrations retroactively canceled.

**VII.   GLA and VDO are harmed by the wet signature rule.**

73.     The Secretary's turnabout, and the SBEC's subsequent issuance of the wet signature rule, caused immediate damage to GLA's voter registration efforts and will severely restrict how it conducts voter registration efforts moving forward.

74.     After the Secretary's instruction to county clerks to reject electronic signatures, but before the wet-signature requirement went into effect as an emergency rule, county clerks were announcing piecemeal whether they would accept electronic signatures. Two GLA staff members contacted each of Arkansas's 75 county clerks to catalog each clerk's position on electronic signatures. Based on that information, GLA staff then redesigned the online tool, devoting over 20

staff hours in one week—a significant amount for a small organization—to account for the various counties' positions on electronic signatures.

75.     Once the emergency rule was issued, GLA was forced to redesign its tool once again to account for the statewide prohibition. This time, it entirely disabled its online voter registration tool, redirecting the "Register to Vote" link on its website to a disclaimer about the emergency rule. Consequently, GLA's ability to register new voters was severely limited.

76.     In preparation for the general election, GLA plans to reactivate the "Register to Vote" tool on its website but will be forced to remove many of its features in order to comply with the wet signature rule. Most notably, applicants will no longer be able to sign the application electronically and have GLA submit it on their behalf. Instead, they must complete the application online, print it out, apply a handwritten wet signature, and then mail or deliver the application to their county clerk themselves.

77.     Without the online tool's electronic signature capabilities, GLA has seen the pace at which it registers new voters decline precipitously. GLA has also ceased engaging in certain other efforts that rely upon the accessibility of the online tool to help voters. This includes asking volunteers to text the link to potential new registrants or asking large groups of people to register simultaneously at public events. Instead, GLA must rely on paper applications, which are less likely to be successfully completed by an applicant.

78.     GLA has also been forced to divert its limited staff and financial resources towards less efficient means of pursuing its voter registration goals, including renewed use of paper registration applications and the dedication of significant staff time towards meeting potential applicants in public spaces, encouraging them to register, and subsequently reminding them to

complete and submit their applicants. This diversion has, in turn, come at the expense of GLA's ability to pursue other parts of its broad civic-engagement mission.

79.     For example, in response to the wet signature rule, GLA has dedicated significant resources towards retraining its staff and hiring full-time paid interns—who needed to be trained as well—to attend public events to encourage people to register to vote using paper applications, an expense it did not have prior to the wet signature rule.

80.     This unexpected pivot has come at the expense of GLA's other programming. Typically, in an election year, GLA would begin planning and implementing get-out-the-vote ("GOTV") programming for the lead-up to the November general election. And although GLA has had its GOTV campaign plans in place since the end of last year, the staff time required to stand up new voter registration operations in response to the wet signature rule has prevented GLA from starting work on those campaigns.

81.     Likewise, GLA staff have had far less time to assist voters who have been purged from voter rolls, effectively eliminating GLA's ability to help such individuals reestablish their registration status and vote in Arkansas elections. While such work was previously a priority for GLA, the organization no longer asks volunteers to assist purged voters either because it must redirect this time towards facilitating in-person interactions to promote voter registration. GLA has also ceased programs aimed at monitoring changes to local election rules and encouraging involvement in local councils and commissions, and it has even abandoned some of its research projects.

82.     The wet signature rule has caused similar harm to VDO, which has developed its own e-signature tool to assist applicants in completing voter registration applications in several states. Consistent with its goal of enhancing political engagement through the use of technology,

VDO would like to deploy its web platform in future elections in Arkansas; but the wet signature rule bars the use of VDO's e-signature function and frustrates its mission.

83.     Consequently, VDO will be forced to redirect limited financial and staff resources from absentee ballot assistance and other GOTV projects, towards less efficient and more resource-intensive ways of assisting voters to register in Arkansas, including its print and mail program. Because the print and mail program is so laborious, VDO will be forced to pull staff members off of the partnerships, program & policy, product, and operations teams to focus on mailing Arkansas voters their nearly-completed voter registration applications.

84.     This diversion of resources, in turn, harms VDO's mission. VDO is a technology-first company with a mission of building best-in-class, culturally competent, cutting-edge digital tools to reach and empower voters across America. But because of the wet signature rule, VDO will be forced to divert its efforts away from building and improving its digital tools.

**CLAIM FOR RELIEF**

**COUNT I**

**Materiality Provision of the Civil Rights Act of 1964**
**52 U.S.C. § 10101(a)(2)(B); 42 U.S.C. §§ 1983, 1988; 28 U.S.C. §§ 2201, 2202**

85.     Plaintiffs incorporate paragraphs one through 84 above as if set forth fully herein.

86.     The materiality provision prohibits any person acting under color of law from "deny[ing] the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election." 52 U.S.C. § 10101(a)(2)(B).

87.     Rejection of a voter registration application, for a paperwork error immaterial to qualification determinations, constitutes denial of the right to vote for purposes of the materiality provision. *See* 52 U.S.C. § 10101(a)(3)(A), (e).

88.     To be eligible to vote in an election in Arkansas, an individual must be (1) a U.S. citizen; (2) a resident of Arkansas; (3) at least 18 years of age; and (4) lawfully registered to vote in that election. Ark. Const. art. 3, § 1(a).

89.     Whether an individual uses an electronic signature on their voter registration application "is not material in determining whether such individual is qualified under [Arkansas] law to vote in such election." 52 U.S.C. § 10101(a)(2)(B).

90.     Rejection of a voter registration application for noncompliance with the wet signature rule is "an error or omission on a[] record or paper relating to an[] application" and constitutes the denial of the right to vote for purposes of the materiality provision. 52 U.S.C. § 10101(a)(2)(B).

91.     Therefore, the wet signature rule violates the materiality provision of the Civil Rights Act of 1964.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Court:

(a)     Declare that the wet signature rule, and any other requirement that applicants sign their voter registration applications by hand or with a wet signature, violates the materiality provision of the Civil Rights Act of 1964;

(b)     Enjoin Defendants, their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from enforcing the wet signature rule, or any other requirement that applicants sign their voter registration applications by hand or with a wet signature;

(c)     Enjoin Defendants, their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from rejecting or refusing to accept a voter registration application on the grounds that the application contains an electronic or digital signature;

(d)     Award Plaintiffs their costs, expenses, and reasonable attorneys' fees, pursuant to 42 U.S.C. § 1988, and any other applicable law.

(e)     Grant Plaintiffs any such other, different, or further relief as this Court deems just and proper.


Dated: June 5, 2024                                    Respectfully submitted,
                                                       */s/ Peter Shults*


**SHULTS LAW FIRM LLP**                                **ELIAS LAW GROUP LLP**
Peter Shults (Ark. 2019021)                            Uzoma N. Nkwonta* (DC 975323)
Amanda G. Orcutt (Ark. 2019102)                        Christopher D. Dodge* (DC 90011587)
Steven Shults (Ark. 78139)                             Omeed Alerasool* (DC 90006578)
200 West Capitol Ave., Suite 1600                      Julie Zuckerbrod* (DC 1781133)
Little Rock, AR 72201                                  250 Massachusetts Ave. NW, Suite 400
T: (501) 375-2301                                      Washington, DC 20001
F: (501) 375-6861                                      T: (202) 968-4490
pshults@shultslaw.com                                  F: (202) 968-4498
aorcutt@shultslaw.com                                  unkwonta@elias.law
sshults@shultslaw.com                                  cdodge@elias.law
                                                       oalerasool@elias.law
                                                       jzuckerbrod@elias.law

                                                       **Pro hac vice* application forthcoming

                                                       *Attorneys for Plaintiffs*