**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

| | |
|---|---|
| GET LOUD ARKANSAS, et al., | |
| Plaintiffs, | Civil Action |
| *v.* | Case No. 5:24-cv-05121-TLB |
| JOHN THURSTON, et al., | |
| Defendants. | |

**BRIEF IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... iii

INTRODUCTION ..................................................................................................................... 1

BACKGROUND ........................................................................................................................ 2

I.   Amendment 51 governs voter registration in Arkansas and does not impose a wet
     signature requirement ..................................................................................................... 2

II.  GLA and VDO develop innovative tools to help Arkansans register to vote..................... 3

III. State officials repeatedly assured GLA that electronic signatures comply with
     Arkansas law. ................................................................................................................. 4

IV.  Weeks later, state officials issued the wet signature rule despite the Attorney
     General's confirmation that electronic signatures are permitted. ...................................... 6

V.   The wet signature rule impedes GLA's and VDO's registration efforts while also
     denying Arkansans the right to register and vote .............................................................. 8

LEGAL STANDARD ............................................................................................................... 11

ARGUMENT ........................................................................................................................... 12

I.   The Civil Rights Act of 1964 prohibits state officials from rejecting voter registration
     applications for errors that are immaterial in determining a person's qualifications to
     vote ............................................................................................................................. 12

II.  Plaintiffs are likely to succeed on their claim that the wet signature rule violates the
     materiality provision of the Civil Rights Act .................................................................. 14

     A.   Rejecting an applicant's registration form constitutes a denial of the right
          to vote under the Civil Rights Act. .......................................................................... 14

     B.   The wet signature rule renders the use of an electronic signature an error or
          omission on a record related to registration. ............................................................ 15

     C.   The use of a wet signature is immaterial in determining whether an individual
          is qualified to vote under Arkansas law. ................................................................... 16

III. Absent relief, Plaintiffs will face continued and ongoing irreparable harm because of
     the wet signature rule. .................................................................................................. 24

IV.  The remaining equitable factors strongly favor granting a preliminary injunction. ......... 26

CONCLUSION ........................................................................................................................ 27

CERTIFICATE OF SERVICE ................................................................................................. 29

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Awad v. Ziriax,*
  670 F.3d 1111 (10th Cir. 2012) ...........................................................................27

*Brandt by & through Brandt v. Rutledge,*
  47 F.4th 661 (8th Cir. 2022) ...............................................................................27

*Cigna Corp. v. Bricker,*
  103 F.4th 1336 (8th Cir. 2024) ...........................................................................24

*Condon v. Reno,*
  913 F. Supp. 946 (D.S.C. 1995)......................................................................12, 13

*D.M. by Bao Xiong v. Minn. State High Sch. League,*
  917 F.3d 994 (8th Cir. 2019) ...............................................................................27

*Eggers v. Evnen,*
  48 F.4th 561 (8th Cir. 2022) ...............................................................................26

*Emineth v. Jaeger,*
  901 F. Supp. 2d 1138 (D.N.D. 2012)....................................................................25

*Fayetteville Pub. Libr. v. Crawford County,*
  684 F. Supp. 3d 879 (W.D. Ark. 2023).................................................................26

*In re Georgia Senate Bill 202,*
  No. 1:21-CV-01259-JPB, 2023 WL 5334582 (N.D. Ga. Aug. 18, 2023) ..............25

*Holbrook v. Healthport, Inc.,*
  432 S.W.3d 593 (Ark. 2014)............................................................................18, 19

*La Unión del Pueblo Entero v. Abbott,*
  No. 5:21-CV-0844-XR, 2023 WL 8263348 (W.D. Tex. Nov. 29, 2023)...................... *passim*

*League of Women Voters of Ark. v. Thurston,*
  No. 5:20-CV-05174, 2023 WL 6446015 (W.D. Ark. Sept. 29, 2023) ...................14

*League of Women Voters of Mo. v. Ashcroft,*
  336 F. Supp. 3d 998 (W.D. Mo. 2018) ............................................................25, 27

*League of Women Voters of N.C. v. North Carolina,*
  769 F.3d 224 (4th Cir. 2014) ..........................................................................25, 26

*Martin v. Crittenden,*
  347 F. Supp. 3d 1302 (N.D. Ga. 2018) ................................................................16

*Martin v. Haas*,
  556 S.W.3d 509 (Ark. 2018)..............................................................................2

*Martin v. Kohls*,
  444 S.W.3d 844 (Ark. 2014)..............................................................................2

*Mi Familia Vota v. Fontes*,
  No. CV-22-00509-PHX-SRB, 2024 WL 862406 (D. Ariz. Feb. 29, 2024) ...............14, 16, 17

*Obama for Am. v. Husted*,
  697 F.3d 423 (6th Cir. 2012) ...........................................................................26

*Reynolds v. Sims*,
  377 U.S. 533 (1964).......................................................................................26

*Schwier v. Cox*,
  340 F.3d 1284 (11th Cir. 2003) ...............................................................14, 15, 16

*Schwier v. Cox*,
  412 F. Supp. 2d 1266 (N.D. Ga. 2005) ...............................................................21

*Sixth Dist. of Afr. Methodist Episcopal Church v. Kemp*,
  574 F. Supp. 3d 1260 (N.D. Ga. 2021) ...............................................................15

*Sleep No. Corp. v. Young*,
  33 F.4th 1012 (8th Cir. 2022) ......................................................................11, 12

*United States v. Georgia*,
  892 F. Supp. 2d 1367 (N.D. Ga. 2012) ...............................................................26

*United States v. Mississippi*,
  380 U.S. 128 (1965).......................................................................................17

*United States v. Pulsifer*,
  39 F.4th 1018 (8th Cir. 2022) ..........................................................................19

*Vote.org v. Byrd*,
  No. 4:23-CV-111-AW-MAF, 2023 WL 7169095 (N.D. Fla. Oct. 30, 2023)...................22, 23

*Vote.org v. Callanen*,
  89 F.4th 459 (5th Cir. 2023) .......................................................................22, 24

*Vote.org v. Ga. State Election Bd.*,
  661 F. Supp. 3d 1329 (N.D. Ga. 2023) ...............................................................15

*Williams v. Salerno*,
  792 F.2d 323 (2d Cir. 1986)..............................................................................26

**Statutes**

1964 Civil Rights Act, 52 U.S.C. § 10101 ............................................................... *passim*

Ark. Code Ann. § 25-16-702(a) .............................................................................20

**Constitutional Provisions**

Ark. Const. art 3, § 1 .............................................................................2, 16, 17

Ark. Const. amend. 51, § 2 ............................................................................3

Ark. Const. amend. 51, § 5 ....................................................................3, 17, 20

Ark. Const. amend. 51, § 6 ..................................................................3, 5, 18, 19

Ark. Const. amend. 51, § 9 ................................................................3, 8, 18, 22

Ark. Const. amend. 51 § 11 ..........................................................................16

**Other Authorities**

Antonin Scalia & Bryan A. Garner, *Reading the Law: The Interpretation of Legal Texts* 170 (2012) .......................................................................................19

Ark. Att'y Gen. Op. No. 2024-049 (Apr. 10, 2024) .................................................7

Calvin R. Ledbetter, Jr., *Arkansas Amendment for Voter Registration Without Poll Tax Payment*, 54 Ark. Hist. Q. 134 (1995) .......................................................2

H.B. 1407, 94th Gen. Assemb., Reg. Sess. (Ark. 2023) ...........................................2

H.B. 1606, 80th Gen. Assemb., Reg. Sess. (Ark. 1995) ...........................................2

H.R. Rep. No. 88-914 (1963), *as reprinted in* 1964 U.S.C.C.A.N. 2391 ...........................2, 12, 27

Justin Levitt, *Resolving Election Error: The Dynamic Assessment of Materiality*, 54 Wm. & Mary L. Rev. 83, 147–48 (2012) .........................................................12

S.B. 271, 84th Gen. Assemb., Reg. Sess. (Ark. 2003) ...............................................2

S.B. 353, 87th Gen. Assemb., Reg. Sess. (Ark. 2009) ...............................................2

*Voting: 1961 Commission on Civil Rights Report, Book 1*, U.S. Comm'n on C.R. (Sept. 9, 1961), https://perma.cc/CC7B-T888 ............................................13

## INTRODUCTION

In early 2024, Plaintiff Get Loud Arkansas ("GLA") launched an online tool to combat Arkansas's historically low rates of voter registration, particularly among young and minority voters. The tool allowed an applicant to complete and sign their voter registration application electronically, after which the applicant could authorize GLA to print their completed application and submit it directly on the applicant's behalf. State officials agreed that this process was perfectly lawful: GLA repeatedly sought and received assurances from the Arkansas Secretary of State's office that the tool complied with existing Arkansas law—a position confirmed by the Attorney General of Arkansas in a formal opinion.

But once the media reported on GLA's success in registering new voters, the Secretary of State abruptly reversed course. In a short letter to county officials, the Secretary advised that they should reject electronically signed applications, without any explanation as to why Arkansas law required such rejection. Just a few weeks later, the State Board of Election Commissioners ("SBEC")—which the Secretary chairs as an *ex officio* member—issued the emergency wet signature rule formalizing the Secretary's about-face, despite the absence of any wet signature requirement in Arkansas law. As a result, many qualified Arkansas voters, including Plaintiffs Nikki Pastor and Blake Loper, have had their voter registration applications rejected simply because they affirmed—under penalty of perjury—the accuracy of their applications with an electronic signature, as thousands of other Arkansans are permitted to do when they register to vote at agencies like the Office of Driver Services ("ODS").

Although the wet signature rule is new to Arkansas, it bears a striking resemblance to the suppressive tactics that spurred Congress to enact the materiality provision in the landmark Civil Rights Act of 1964. The provision seeks to eliminate opportunities for arbitrary and discriminatory practices "in the registration of voters for Federal elections . . . by prohibiting the disqualification

of an individual because of immaterial errors or omissions in papers or acts" requisite to voting. H.R. Rep. No. 88-914 (1963), *as reprinted in* 1964 U.S.C.C.A.N. 2391, 2394. Yet more than half a century later, the wet signature rule has made it so that Arkansas's election officials must reject mail voter registration applications simply because the applicants signed with the "wrong" instrument—a meaningless technicality that creates unlawful barriers to the franchise.

Plaintiffs move for a preliminary injunction to enforce the guarantees of the Civil Rights Act and to immediately enjoin the enforcement of Arkansas's wet signature rule.

## BACKGROUND

I.  **Amendment 51 governs voter registration in Arkansas and does not impose a wet signature requirement.**

Under the Arkansas Constitution, any person may vote in an election if they are: a U.S. citizen; a resident of Arkansas; at least eighteen 18 years of age; and "[l]awfully registered to vote in the election." Ark. Const. art. 3, § 1; *see also Martin v. Haas*, 556 S.W.3d 509, 512 (Ark. 2018). The voter registration process in Arkansas is governed by Amendment 51 to the Arkansas Constitution, *see Martin v. Kohls*, 444 S.W.3d 844, 850 (Ark. 2014), which was originally added by citizen initiative to replace the state's poll tax with a modern voter registration system, *see generally* Calvin R. Ledbetter, Jr., *Arkansas Amendment for Voter Registration Without Poll Tax Payment*, 54 Ark. Hist. Q. 134 (1995), and was amended several times by the Legislature in the intervening decades. *See, e.g.*, H.B. 1606, 80th Gen. Assemb., Reg. Sess. (Ark. 1995); S.B. 271, 84th Gen. Assemb., Reg. Sess. (Ark. 2003); S.B. 353, 87th Gen. Assemb., Reg. Sess. (Ark. 2009); H.B. 1407, 94th Gen. Assemb., Reg. Sess. (Ark. 2023). Today, under Amendment 51, a person may register to vote in several ways. First, they may submit a voter registration application created

by the Secretary of State to their respective county clerk in person, by mail,[1] *see* Ark. Const. amend. 51, §§ 6(a), 9(c)(1), or through a third-party organization authorized to submit mail applications on the voter's behalf. *E.g.*, *id.* § 6(a)(2)(G). An applicant may also register to vote at ODS or at state public assistance offices. *Id.* § 5(a).

Although it requires applicants to provide a "signature or mark made under penalty of perjury that the applicant meets each requirement for voter registration," *id.* § 6(a)(3)(F), Amendment 51 does not mandate the use of any specific method or instrument in entering that signature or mark, *see id.* § 6(b)(1), and state agencies often register voters using a digital application process that requires electronic signatures, *id.* § 5(b)(1)–(4). Once a county clerk receives a voter registration application, the clerk "shall register qualified applicants" if the application is "legible and complete." *Id.* § 9(c)(1); *see also id.* § 9(c)(3)(A).

## II.     GLA and VDO develop innovative tools to help Arkansans register to vote.

Plaintiff Get Loud Arkansas ("GLA") was founded in 2021 to address Arkansas's lowest-in-the-nation rates of voter registration and voter turnout.[2] *See generally* Declaration of Kristin Foster ("Foster Decl.") ¶ 3. In its first few years of existence, GLA pursued its voter registration mission by distributing paper applications to register new voters, but it quickly realized the limitations of this approach. *Id.* ¶ 9. As a result, it committed significant effort and resources towards developing and launching an online tool that allows Arkansans to complete and sign a

---

[1] Each county in Arkansas has a county clerk who serves as the "Permanent Registrar" of that county. Ark. Const. amend. 51, § 2(b).

[2] According to the U.S. Census Bureau, only 62 percent of Arkansas citizens were registered to vote during the November 2020 election, and only 54 percent of Arkansas citizens voted in that election. Declaration of Christopher D. Dodge ("Dodge Decl."), Ex. A (tbl. 4a). In contrast, the nationwide averages for voter registration and voter turnout during that election were 73 percent and 67 percent, respectively. *Id.*, Ex. A (tbl. 4a). Unfortunately, these disparities are even more severe for minority and young voters in Arkansas. *Id.*, Ex. A. (tbls. 4b & 4c).

voter registration application on their phone, tablet, or computer in a process that takes less than two minutes. *Id.* ¶¶ 10–13, 19. To use the online tool, an applicant enters the information necessary to complete the voter registration application prescribed by the Secretary of State, in accordance with Amendment 51, and then uses their finger, stylus, or mouse to sign their name confirming the accuracy of the application under penalty of perjury. *Id.* ¶ 14. Once the application is complete, the applicant may review their application and then authorize GLA to print and submit it to their county clerk. *Id.* GLA released this online tool in January 2024, and almost immediately saw a rapid increase in the rate at which it registered new voters. *Id.* ¶¶ 13, 15.

Plaintiff Vote.org ("VDO") is a nationwide organization that also develops online voter registration tools with electronic signature options and offers them to voters in states across the country. Declaration of Andrea Hailey ("Hailey Decl.") ¶¶ 3, 8. VDO's online tools are specifically designed to meet the needs and legal requirements of each state in which it offers them. *Id.* ¶ 4. And one of the most effective features of its online tools is the e-sign function, which allows applicants to upload an image of their handwritten signature into VDO's web application and have their completed voter registration application sent to the appropriate officials. *Id.* ¶ 8. Currently, however, VDO is not able to use its e-sign function in Arkansas; applicants must still print, physically sign, and then submit their application to their county clerk. *Id.* ¶ 8–10. But for the wet signature rule, VDO would utilize its e-sign function for upcoming elections in Arkansas. *Id.* ¶ 9.

## III.   State officials repeatedly assured GLA that electronic signatures comply with Arkansas law.

In early 2024, as GLA began to promote its new online voter registration tool at events across Arkansas, it sought assurance from the Secretary of State's office that the tool complies with Arkansas law. Foster Decl. ¶ 21. GLA had every reason to believe that it did, as Arkansas

law does not require that a voter registration applicant's "signature or mark" be made with any particular instrument, so long as it is "made under penalty of perjury that the applicant meets each requirement for voter registration." Ark. Const. amend. 51, § 6(a)(3)(F). And GLA's tool requires applicants to review and affirm the identical sworn statement prescribed by the Secretary. Foster Decl. ¶ 14. Nevertheless, GLA sought the Secretary's opinion on its new online tool. *Id.* ¶ 21. And, on no fewer than *three occasions*, the Secretary's office expressly stated that the electronic signature function on GLA's new tool complies with Arkansas law.

First, on February 5, 2024, GLA's founder and executive director, former State Senator Joyce Elliott, emailed the Secretary of State's office to confirm GLA's understanding that there was no wet signature requirement in Arkansas law for voter registration applications. *Id.* ¶ 22, Ex. A. Within 30 minutes, the Secretary of State's office responded, "our attorneys looked into this last week and came to the same conclusion [as GLA] about the wet signature." *Id.* ¶ 22, Ex. A.

Later that same afternoon, GLA's Deputy Director, Kristin Foster, contacted the Secretary's office once again, explaining that, when applying to register with GLA's tool, applicants sometimes sign the touchscreen with a stylus and sometimes with their finger, and asked: "So just to make sure I'm understanding correctly – the registrations we submit right now are not going to be rejected based on the signature. . . . Is that correct?" *Id.* ¶ 22, Ex. A. The Secretary of State's office replied that, while it could not "officially speak on the acceptance or rejection of applications" because the "authority lies solely with the county clerk's office," its "unofficial, non-attorney, advice to the county clerks would be to err on the side of the voter and accept the registrations." *Id.* ¶ 22, Ex. A.

Finally, on February 12, 2024, Ms. Foster again wrote to the Secretary of State's office and asked, among other questions: "For registration purposes, should digital signatures be treated

differently than 'wet' signatures?" *Id.* ¶ 22, Ex. B. On February 14, 2024, the Secretary of State's office stated: "[T]he Secretary of State does not see how a digital signature should be treated any differently than a wet signature." *Id.* ¶ 22, Ex. B.

Based on these repeated assurances, GLA invested time and resources in rolling out and promoting its new voter registration tool at community events, schools, and other places where it seeks to register voters. *Id.* ¶ 16–18. And it set a goal of registering over 9,000 voters—nearly quadruple its goal for 2023—which seemed easily attainable given the efficiency and reach of its new voter registration tool. *See id.* ¶¶ 8, 31.

## IV. Weeks later, state officials issued the wet signature rule despite the Attorney General's confirmation that electronic signatures are permitted.

Despite its earlier representations to GLA, the Secretary of State's office abruptly reversed course just weeks later. On February 28, 2024—two days after the Arkansas Times reported on GLA's success registering new voters, "especially young ones" with its online tool[3]—the Secretary wrote a letter to all county clerks, stating: "It has come to my attention that there have been some entities registering citizens to vote by electronic applications and signature. . . . I strongly recommend that counties do not accept voter registration applications executed by electronic signature." Dodge Decl., Ex. B. The Secretary's two-paragraph letter provided no explanation or legal basis for his sudden shift in position. *Id.*, Ex. B.

On March 12, 2024—having already advised county clerks to reject applications with electronic signatures—the Secretary of State belatedly asked the Attorney General for an opinion on the lawfulness of such signatures on voter registration applications. The Secretary wrote:

---

[3] Mary Hennigan, *Get Loud Arkansas sees success in new voter registration strategy*, Ark. Times (Feb. 26, 2024), https://arktimes.com/news/2024/02/26/get-loud-arkansas-sees-success-in-new-voter-registration-strategy/.

> My office has received inquiries regarding the use of electronic voter registration applications, created by a third-party non-governmental agency, that include an electronic signature. These applications are then either printed out and turned in or sent electronically to county clerks. I'm asking for a formal opinion from your office as to whether this practice is allowed under Arkansas law.

*Id.*, Ex. C. And, on April 10, 2024, the Attorney General issued an opinion stating that "an electronic signature or mark is generally valid under Arkansas law" and that:

> Consequently, given the historical acceptance of signatures produced through a variety of means, the widespread acceptance of electronic signatures, and the fact that Amendment 51 does not contain any restrictions on how a "signature or mark" may be made, I believe that an electronic signature satisfies Amendment 51's "signature or mark" requirement.

*Id.*, Ex. D at 1, 3 (Ark. Att'y Gen. Op. No. 2024-049 at 1, 3 (Apr. 10, 2024)). In other words, the Attorney General's opinion *confirmed* the Secretary's initial position that electronic signatures satisfy Amendment 51 and that GLA's tool complied with Arkansas law.

Nonetheless, after the Attorney General issued his opinion approving of electronic signatures, the SBEC, led by the Secretary, proceeded to issue an emergency rule prohibiting electronic signatures on voter registration applications. *See id.*, Ex. E.[4] The SBEC explained that its motivation for the emergency rule was to address a "difference in treatment for voter applicants, depending on which county they reside." *Id.*, Ex. E at 4–5, 14. The SBEC acknowledged the rule was issued in response to "third-party registration organizations" (*i.e.*, GLA) that had been assisting voters in submitting applications signed under penalty of perjury with an electronic signature. *Id.*, Ex. E at 4–5. And it repeatedly identified GLA as an organization likely to be impacted by the new rule, all but admitting the emergency rulemaking was specifically targeting GLA's new voter registration tool. *Id.*, Ex. E at 6–7.

---

[4] Before promulgating the emergency rule, the SBEC issued a declaratory order interpreting Amendment 51 to permit electronic signatures for voter registration applications that are processed through identified voter registration agencies, but not for mail applications. Dodge Decl., Ex. G.

The resulting "wet signature rule" bans electronic signatures on mail registration applications in three ways: First, it grafts non-textual language onto the term "signature or mark" in Amendment 51, redefining it to mean "a handwritten wet signature or handwritten wet mark made on a Registration Application Form with a pen or other writing device that is physically moved across the form and that forms the applicant's signature or mark on the paper form." *Id.*, Ex. F. Second, the wet signature rule provides that "[a] Signature or Mark that utilizes a computer to generate or recreate the applicant's signature or mark" is not acceptable, even though Amendment 51 imposes no such prohibition. *Id.*, Ex. F. Third, while Amendment 51 requires county clerks to accept voter registration applications that are "legible and complete," *see* Ark. Const. amend. 51 § 9(c)(1), (c)(3)(A), the wet signature rule adds that voter registration applications must also be "executed" with a "Signature or Mark" as defined by the rule—in other words, with a pen or other physical writing device. Dodge Decl., Ex. F.

Although the emergency rule expires on September 1, 2024, *id.*, Ex. E at 4, the SBEC has proposed a final rule that mirrors the text of the emergency rule.[5]

## V.    The wet signature rule impedes GLA's and VDO's registration efforts while also denying Arkansans the right to register and vote.

***Get Loud Arkansas.*** In pursuit of its mission to improve civic engagement in Arkansas, GLA's first and highest priority is to register new voters, and particularly young and minority Arkansans. Foster Decl. ¶¶ 8–9. During its brief time operating, GLA's tool achieved remarkable success; it not only helped GLA register an unprecedented number of voters, but also made GLA's

---

[5] Per procedures adopted on June 12, 2024, the SBEC opened a comment period on the proposed final rule on June 14, concluding on July 14, and with a public hearing scheduled for July 11. Dodge Decl., Ex. H. The SBEC plans to meet on July 15 such that public comments can be addressed before the Arkansas Legislative Council can consider and approve the final rule at its August 16, 2024 meeting. *Id.*, Ex. H.

own outreach efforts more effective and cost-efficient. *Id.* ¶¶ 15–16. For example, it became easier for GLA to disseminate the application electronically using QR codes and text messages, as compared to traditional paper forms. *Id.* ¶¶ 17–19. Indeed, many people who registered through GLA's online tool forwarded the link to friends and family—something that cannot be done with paper applications—which helped further GLA's reach to all 75 counties in Arkansas. *Id.* ¶ 19; *see also* Declaration of Blake Loper ("Loper Decl.") ¶¶ 5–6. In the short time the online tool was available, GLA saw significantly higher rates of successful voter registration. Foster Decl. ¶ 20.

The Secretary of State's about-face and the SBEC's subsequent issuance of the wet signature rule have seriously harmed GLA and continue to do so. After taking it offline for weeks, GLA was forced to redesign its online tool to account for the prohibition on the use of electronic signatures, rendering it far less effective. *Id.* ¶¶ 29–30. While applicants may still prefill their application with personal information, they now must print it out themselves, sign it with a wet signature, and mail or deliver it to their county clerk. *Id.* ¶ 30. Not only does this take far longer than the two minutes required by the original tool, it renders the tool useless to those without ready access to a printer. *Id.* ¶ 30. Unsurprisingly, GLA has seen its success rate at registering voters plummet. *Id.* ¶ 31. With the original tool in place, nearly 100 percent of applicants fully completed the application and had it submitted; but without the electronic signature option, that rate stands closer to 33 percent. *Id.* ¶ 20. At the same time, the wet signature rule has made it far more difficult to reach potential voters beyond those 15 counties on which GLA traditionally focused its efforts, especially in rural counties. *Id.* ¶ 18.

Because it may not rely on the tool to achieve its voter registration goals, GLA has also been forced to divert its limited staff and financial resources towards less efficient means of registering voters, including renewed use of paper registration applications and more staff-

intensive efforts for engaging voters, encouraging them to register, and subsequently reminding them to complete and submit their applicants. *Id.* ¶ 32. This unexpected pivot has come at the expense of GLA's other programming, as GLA has been forced to redirect significant staff time and financial resources away from other initiatives, including its GOTV campaign and its efforts to assist individuals who may have been incorrectly purged from the voter rolls. *Id.* ¶¶ 33–34.

*Vote.org.* The wet signature rule has similarly impaired VDO's efforts in Arkansas. Nationwide, one of the most effective features of VDO's tools has been the e-sign function, which allows qualified voters in states across the country to digitally enter information into a voter registration application, sign the application by uploading an image of their original signature, review their signed voter registration application, and then have the completed application sent to the appropriate registration official. Hailey Decl. ¶ 8. VDO has invested significant resources in developing this e-sign function and would like to offer it to applicants in Arkansas, just as it has done in other states. *Id.* ¶ 9. But it cannot do so for the upcoming 2024 elections and beyond because of the wet signature rule. *Id.*

Consequently, the wet signature rule impedes VDO's voter registration activities and impairs its ability to accomplish its mission by forcing it to rely on less effective means of assisting voters to register. *Id.* ¶ 10.

*Individual Voters.* Many otherwise qualified Arkansans have had their voter registration applications rejected for using an electronic signature, including Plaintiffs Nikki Pastor and Blake Loper.

Nikki Pastor, who grew up in Clinton, Arkansas, has been a resident of Washington County, Arkansas since August 2023. Declaration of Nikki Pastor ("Pastor Decl.") ¶ 4. On February 24, 2024, Pastor completed a registration application using GLA's online tool. *Id.* ¶¶ 7–

9. Pastor gave GLA approval to print the application and submit it to the Washington County Clerk, which GLA did. *Id.* ¶ 9. But Pastor's application was rejected by the Washington County Clerk for its use of an electronic signature. *Id.* ¶ 11.

Blake Loper grew up in Dardanelle, Arkansas, in Yell County, and has been a resident of Russellville, in Pope County, since November 2022. Loper Decl. ¶ 3. After moving to Pope County from Yell County, Loper used GLA's online tool to complete and sign a voter registration application to match their new address. *Id.* ¶¶ 4–5. Loper authorized GLA to print and submit the application to the Pope County Clerk, which GLA did. *Id.* ¶¶ 5, 7. But in a notice dated May 2, 2024, Loper was informed by the Pope County Clerk that the application was rejected for its use of an electronic signature. *Id.* ¶ 8, Ex. A.

In addition to Pastor and Loper, many other Arkansans have similarly had their registration applications denied after using GLA's online tool. For example, dozens of high school students in Camden, Arkansas, in Ouachita County, used GLA's online tool to complete and sign applications that were subsequently rejected. Foster Decl. ¶ 27. Absent relief here, any other Arkansan who submits an otherwise legible and complete mail application with an electronic signature will suffer the same rejection.

## LEGAL STANDARD

In determining whether to issue a preliminary injunction, a district court must consider four factors: "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that [the] movant will succeed on the merits; and (4) the public interest." *Sleep No. Corp. v. Young*, 33 F.4th 1012, 1016 (8th Cir. 2022) (alteration in original) (quoting *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc)). "Although no single factor

is dispositive, and the district court must balance all factors to determine whether the injunction should issue, the third factor—probability of success—is the most significant." *Id.* (cleaned up).

## ARGUMENT

**I.    The Civil Rights Act of 1964 prohibits state officials from rejecting voter registration applications for errors that are immaterial in determining a person's qualifications to vote.**

Congress enacted the Civil Rights Act of 1964 "to protect and provide more effective means to enforce the civil rights of persons within the jurisdiction of the United States," and particularly to reduce "obstacles to the exercise of the right to vote and provide means of expediting the vindication of that right." H.R. Rep. No. 88-914, *as reprinted in* 1964 U.S.C.C.A.N. 2391, 2391. In Title I of the Act, Congress sought to eliminate arbitrary denials of the right to vote based on irrelevant paperwork errors that election officials often used to the disenfranchise Black citizens. *See id.* at 2393.

Congress had good reason to be concerned about such methods of disenfranchisement. Extensive testimony showed that many local registrars rejected Black applicants based on hyper-technical or entirely invented errors, while they ignored more substantive errors when the applicants were white. *See* Justin Levitt, *Resolving Election Error: The Dynamic Assessment of Materiality*, 54 Wm. & Mary L. Rev. 83, 147–48 (2012). One infamous example was an application that was rejected because the applicant failed to properly calculate her age in years, months, and days; she missed the mark by one day because the day had not yet ended. *Id.* at 148 (citing legislative record); *see also Condon v. Reno*, 913 F. Supp. 946, 950 (D.S.C. 1995). Similarly, during this same period, an application in Louisiana was rejected because the applicant misspelled their state as "Louiseana." Levitt, *supra*, at 148 (citing legislative record). Other applications were rejected because the applicant identified their skin color as "Negro" instead of

"brown" or "brown" instead of "Negro," and because an applicant underlined "Mr." when he should have circled it. *Id.* (citing legislative record).

These practices resulted in disparate voting opportunities for non-white voters in many states, including in Arkansas. In 1961, for example, the U.S. Commission on Civil Rights observed that Black Arkansans remained disproportionately unregistered to vote compared to white Arkansans. *See Voting: 1961 Commission on Civil Rights Report, Book 1* at 105, U.S. Comm'n on C.R. (Sept. 9, 1961).[6] As arbitrary barriers continued to disenfranchise voters, Congress determined that national legislation was necessary to extinguish election officials' persistent attempts to evade civil rights protections.

In the 1964 Civil Rights Act, Congress, in its effort to eradicate persistent voter suppression tactics, prohibited state officials from using trivial paperwork errors to deny *any* citizen the right to vote. Specifically, Section 101 of the Act states in part:

> No person acting under color of law shall . . . deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election[.]

52 U.S.C. § 10101(a)(2)(B). Under this statute—often referred to as the materiality provision— states can no longer use arcane rules and administrative traps to prevent qualified voters from exercising their fundamental right to vote.

The materiality provision's text prescribes three elements for a claim under the law: (1) the denial of any individual's right to vote, as the Civil Rights Act defines that term; (2) because of an error or omission on any paper relating to registration or other act requisite to voting; (3) where such error or omission is not material in determining whether an individual is qualified to vote

---

[6] Available at https://perma.cc/CC7B-T888.

under state law. *Id.*; *see also League of Women Voters of Ark. v. Thurston*, No. 5:20-CV-05174, 2023 WL 6446015, at *16–18 (W.D. Ark. Sept. 29, 2023). Plaintiffs are likely to succeed in establishing those elements here.

## II. Plaintiffs are likely to succeed on their claim that the wet signature rule violates the materiality provision of the Civil Rights Act.

Rejecting a voter registration application based on the instrument an applicant uses to sign their registration form is precisely the kind of disenfranchisement that Congress sought to prevent when it enacted the Civil Rights Act of 1964. A straightforward application of the materiality provision compels the conclusion that the wet signature rule cannot pass muster, and Plaintiffs are likely to succeed on the merits of their claim.

### A. Rejecting an applicant's registration form constitutes a denial of the right to vote under the Civil Rights Act.

The first element of a materiality provision claim is whether a challenged state law or practice "den[ies] the right of any individual to vote in any election." 52 U.S.C. § 10101(a)(2)(B). The Civil Rights Act defines "vote," as used in the materiality provision, to include "all action necessary to make a vote effective including . . . *registration*." *Id.* § 10101(e) (emphasis added); *see also id.* § 10101(a)(3) (incorporating definition for purposes of materiality provision). Thus, when Arkansas election officials reject voter registration applications under the wet signature rule, they deny Arkansans the statutory right to vote.

Federal courts have uniformly recognized that the term "vote" as used in the materiality provision includes not only the ultimate act of casting a ballot, but also successfully registering to vote in the first place. *See, e.g.*, *Schwier v. Cox*, 340 F.3d 1284, 1294 (11th Cir. 2003); *Mi Familia Vota v. Fontes*, No. CV-22-00509-PHX-SRB, 2024 WL 862406, at *37 (D. Ariz. Feb. 29, 2024).

It makes no difference that a prospective voter whose application is rejected under the wet signature rule may be able to submit a new application before the registration deadline. "Denial of

the statutory right to vote under Section 101 is complete when a particular application . . . is rejected; an opportunity to cure the rejection[ or] submit another application . . . does not negate the denial of the statutory right to vote." *La Unión del Pueblo Entero v. Abbott*, No. 5:21-CV-0844-XR, 2023 WL 8263348, at \*22 (W.D. Tex. Nov. 29, 2023) ("*LUPE*"), *stayed pending appeal sub nom. United States v. Paxton*, No. 23-50885 (5th Cir. Dec. 15, 2023) (per curiam); *see also Vote.org v. Ga. State Election Bd.*, 661 F. Supp. 3d 1329, 1339 (N.D. Ga. 2023) (rejecting "argument that the opportunity to cure an error rehabilitates any potential violation"); *Sixth Dist. of Afr. Methodist Episcopal Church v. Kemp*, 574 F. Supp. 3d 1260, 1282 (N.D. Ga. 2021) (same).

Because the plain text of the Civil Rights Act is clear that rejecting a registration application denies individuals the right to vote for purposes of the materiality provision, Plaintiffs satisfy the first element of their claim.

**B.    The wet signature rule renders the use of an electronic signature an error or omission on a record related to registration.**

Once a plaintiff has shown that a challenged state rule denies the right to vote, they next must show that it does so because "of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting." 52 U.S.C. § 10101(a)(2)(B). The wet signature rule is a requirement that applies to the signature or mark "made on a Registration Application Form," Dodge Decl., Ex. F, and thus straightforwardly concerns a "record or paper relating to any application [or] registration," 52 U.S.C. § 10101(a)(2)(B), satisfying the second element of the materiality provision. Indeed, federal courts have further uniformly agreed that the materiality provision applies to requirements about how to complete the information requested on voter registration forms. *See, e.g.*, *Schwier*, 340 F.3d at 1294.

The wet signature rule also makes it an "error or omission" to sign a voter registration application with anything other than a "handwritten wet mark made . . . with a pen or other writing

device that is physically moved across the form and that forms the applicant's signature or mark." Dodge Decl., Ex. F. Thus, even when an otherwise qualified applicant uses an electronic signature (or any other instrument) to sign the mail voter registration form, their application will be rejected for the omission of a wet signature. Plaintiffs therefore satisfy the second element of their materiality provision claim.

### C. The use of a wet signature is immaterial in determining whether an individual is qualified to vote under Arkansas law.

A wet signature on a voter registration application is not material in determining voter qualifications. The rule simply "increase[s] the number of errors or omissions on the application forms, thus providing an excuse to disqualify potential voters," *Schwier*, 340 F.3d at 1294, and is precisely the type of practice the materiality provision was enacted to prevent. *Id.* This is clear from a review of Arkansas's substantive qualifications for voting; the State's acceptance of electronic signatures for *other* kinds of voter registration applications; and from the plain text of Arkansas's voter registration laws.

### 1. The wet signature rule is immaterial on its face because it bears no relationship to Arkansas's substantive voter qualifications.

"To determine whether an error or omission is material, the information required must be compared to state-law qualifications to vote." *LUPE*, 2023 WL 8263348, at *14; *see also Martin v. Crittenden*, 347 F. Supp. 3d 1302, 1308 (N.D. Ga. 2018); *Mi Familia Vota*, 2024 WL 862406, at *37. The qualifications to vote under Arkansas law consist of: (1) U.S. citizenship, (2) Arkansas residency, (3) being at least eighteen years old, (4) not having been convicted of a felony, and (5) not having been adjudged mentally incompetent by a court. *See* Ark. Const. art. 3, § 1(a); Ark.

Const. amend. 51 § 11(a).[7] The instrument a prospective voter uses to sign their registration application bears no relationship to any of these qualifications. Tellingly, when issuing the wet signature rule, the SBEC nowhere explained how the use of a wet signature is even "useful or minimally relevant"—never mind "material"—in "determining a person's eligibility to vote." *Mi Familia Vota*, 2024 WL 862406, at \*37 (explaining that required information be "*more* than useful or minimally relevant" to survive scrutiny under materiality provision (emphasis added)). And critically, county election officials do not consider the type of instrument used in signing or marking a voter registration application as a factor in determining whether the applicant is or is not qualified to vote in Arkansas. *See* Declaration of Susan Inman ("Inman Decl.") ¶¶ 15–20.

> **2.      The wet signature rule cannot be material in determining voter qualifications because the Arkansas Constitution explicitly allows for electronically signed voter registration applications.**

Arkansas's voter registration procedures also confirm that a wet signature is immaterial in determining voter qualifications. As explained, *supra* Background Part I, Arkansas permits a person to register to vote at various state agencies, like ODS. *See* Ark. Const. amend. 51 § 5(a). These agencies may employ a "computer process" to register applicants, which permits use of an electronic signature on digital applications. *Id.* § 5(b)(1)–(4). In other words, many of the registration applications received and approved by Arkansas's election officials—either through ODS or another state agency—are signed with electronic signatures. *See* Inman Decl. ¶¶ 18–19.

---

[7] Although Arkansas also requires voters to be "[l]awfully registered to vote in the election," Ark. Const. art. 3, § 1, it does not follow that every state registration requirement is, *ipso facto*, material. That logic "would erase the Materiality Provision from existence, by defining *whatever* requirements might be imposed by state law in order to vote, no matter how trivial, as being material in determining whether such individual is qualified under State law to vote in such election." *LUPE*, 2023 WL 8263348, at \*14 (quotation marks omitted); *cf. United States v. Mississippi*, 380 U.S. 128, 137–38 (1965) (phrase "otherwise qualified by law" in Section 10101(a)(1) cannot include invalid statutes; Congress "obviously" meant "qualifications required of all voters by valid state or federal laws").

That forecloses any argument that a wet signature is necessary to determine voter qualifications. The SBEC's rulemaking nowhere explained why an electronic signature is material in one context, but not another.

> **3.    The wet signature rule is contrary to the Arkansas Constitution and thus does not serve any conceivable legislative purpose.**

The wet signature rule also cannot be rationalized by any legislative judgment that a handwritten signature is material in determining voter qualifications (even assuming such judgment matters for purposes of satisfying a federal law). On the contrary, Amendment 51 provides that election officials "shall register" qualified applicants who submit "a legible and complete voter registration application." Ark. Const. amend. 51 § 9(c)(1). And while a signature or mark is required to complete an application, there is no requirement that the signature be applied with any specific instrument. Indeed, the only express requirement is that the signature or mark be "made under penalty of perjury" and affirm "that the applicant meets each requirement for voter registration." *Id.* § 6(a)(3)(F). Although the Arkansas Legislature has frequently modernized Amendment 51 in the last three decades, it has never added any further qualification, reflecting the legislative intent that a voter registration application is complete—and must be accepted by a county clerk—with *any* signature made under penalty of perjury that affirms the accuracy of the application. The SBEC's wet signature rule attempts to supplement the Constitution's text with additional requirements—that the signature is "wet."

Indeed, the SBEC's effort to graft language onto Amendment 51 violates basic rules of statutory construction, including that statutory terms must be read in a "consistent, harmonious, and sensible" manner in view of the "act in its entirety." *Holbrook v. Healthport, Inc.*, 432 S.W.3d 593, 597 (Ark. 2014). Section 6 of Amendment 51 uses the phrase "signature or mark" twice to explain what is required on (1) the mail application form, and (2) in the process used by the ODS

18

and other qualified voter registration agencies that indisputably allow use of an electronic signature. Ark. Const. amend. 51 § 6(a)(3)(F), (b)(1)(G). That phrase—"signature or mark"—presumably has the same meaning in each case. After all, courts presume "that identical words used in different parts of the same statute have the same meaning." *United States v. Pulsifer*, 39 F.4th 1018, 1022 (8th Cir. 2022), *aff'd*, 601 U.S. 124 (2024); *accord* Antonin Scalia & Bryan A. Garner, *Reading the Law: The Interpretation of Legal Texts* 170 (2012). And here the phrase "signature or mark" is used twice not merely in the same statute, but in the very same subsection of the Arkansas Constitution.

The SBEC's interpretation of the term "signature or mark" turns this fundamental rule of statutory construction on its head. It is undisputed that the term "signature or mark" includes electronic signatures when used in reference to the computer process employed by ODS and certain other public agencies. Ark. Const. amend. 51 § 6(b)(1)(G); *see also* Dodge Decl., Ex. G at 2 (SBEC explaining that a county clerk may accept an application that is electronically signed if it comes from an identified registration agency). But according to the SBEC, the very same term, used in the very same section, *excludes* electronic signatures when used in the context of the mail form. Dodge Decl., Ex. G at 9–10; *see also* Ark. Const. amend. 51 § 6(a)(3)(F). Nothing in the text of Amendment 51 supports providing such disparate meanings to the same terms, as employed in the same section. In contrast, giving a consistent definition to the term "signature or mark"—text which on its face includes electronic signatures—harmonizes the two uses of the term in Amendment 51, making clear that county clerks "shall" accept any complete and legible application made with a signature under penalty of perjury. *See Holbrook*, 432 S.W.3d at 597.

That plain text reading of Amendment 51 is bolstered by the Attorney General's advisory opinion, which similarly explained that "[t]he Arkansas Constitution does not define a 'signature

or mark,' nor does it specify how a signature or mark may be made," and accordingly, "an electronic signature satisfies Amendment 51's 'signature or mark' requirement." Dodge Decl., Ex. D at 2–3. These acknowledgments from "the attorney for all state officials," Ark. Code Ann. § 25-16-702(a) (describing duties of Attorney General), and the State's "chief election official," Ark. Const. amend. 51, § 5(b)(1) (duties of Secretary), further confirm that a wet signature is not material in determining voter qualifications in Arkansas. And the Secretary's own representations to GLA make clear that, before the wet signature rule, it was uncontroversial that electronic signatures satisfied Amendment 51. While the Secretary later sent a letter—bereft of legal analysis—reversing his office's earlier opinion, his own "attorneys [previously] came to the same conclusion [as GLA] about the" meaning of Amendment 51. Foster Decl. ¶ 22, Ex. A. And the Secretary himself "d[id] not see how a digital signature should be treated any differently than a wet signature." *Id.*, Ex. B.

### 4. Other purported state interests in enforcing the wet signature rule do not make wet signatures material in determining voter qualifications.

Defendants also cannot try to rationalize the wet signature rule by pointing to some other purpose apart from determining voter eligibility. As the plain text of the statute makes clear, state actors violate the materiality provision if they deny any individual the right to vote based on a requirement that is immaterial "in determining whether such individual is qualified . . . to vote." 52 U.S.C. § 10101 (a)(2)(B). The rules governing a voter's qualification to register are "distinct from rules governing the conduct of elections." *LUPE*, 2023 WL 8263348, at *14, *16 (citing *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 13–17 (2013), and *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 666 (1966)). Thus, "the wisdom of the [wet signature rule] is entirely irrelevant to the Court's analysis of Plaintiffs' Section 101 claims on the merits" because "the Materiality Provision is not a burden-interest balancing statute. Materiality Provision

20

violations are prohibited no matter their policy aim." *Id.* at \*8; *see also Schwier v. Cox*, 412 F. Supp. 2d 1266, 1276 (N.D. Ga. 2005), *aff'd*, 439 F.3d 1285 (11th Cir. 2006) (holding preventing "fraud" did not render mandatory disclosure of social security number "material").

In any event, county election officials do not consider the type of instrument used in signing a voter registration application as a factor in determining whether an applicant is qualified to vote. *See* Inman Decl. ¶¶ 15–20. County clerks are advised to accept voter registration applications with any type of signature or mark, *id.* ¶ 16, and there is no practice among county clerks of rejecting voter registration applications based on the quality or method of the signature, *id.* ¶ 17. Nor does the wet signature rule serve any function in determining the qualifications of absentee voters. While an absentee ballot application signature is compared to the voter's signature on their voter registration application, the comparable signature is *frequently* an electronic signature, since many voter registration forms come from voter registration agencies where applications are signed electronically. *Id.* ¶¶ 18–19. Additionally, when election officials compare signatures, they generally are viewing PDF scans of the signatures, and as a practical matter, it is very difficult to tell the difference between a signature made by pen and a signature made by a stylus (with electronic ink) or a digital image of a handwritten signature that is then printed and submitted. *Id.* ¶ 19. The wet signature rule therefore serves no function whatsoever in determining voters' qualifications.

Moreover, the SBEC was explicit that the purpose of the wet signature rule was to "resolve a conflict among county clerks" and promote "uniformity across the state." *See, e.g.*, Dodge Decl., Ex. E at 4–5; *id.*, Ex. I at 15:16–17. That explanation has nothing to do with determining a voter's qualifications, and thus provides no answer to Plaintiffs' materiality provision claim. And it is also unpersuasive on its own terms. Rather than promote uniformity, the wet signature rule establishes

a two-tiered system that allows some voters to sign their application forms electronically (such as those who do so at ODS) while denying the same right to others (those who mail or hand deliver an application at their county clerk's office). In contrast, Plaintiffs' construction ensures complete uniformity across the state, guaranteeing that all Arkansans may use electronic signatures regardless of where or how they register to vote. That construction is consistent with the Legislature's command that county clerks "shall" accept legible and complete voter registration forms signed under penalty of perjury. Ark. Const. amend. 51, § 9(c)(1), (c)(3)(A).

### 5.  Neither the Fifth Circuit's nor a Florida district court's determination that a wet signature requirement was material requires the same result here.

For at least two reasons, this Court should not rely on *Vote.org v. Callanen*, 89 F.4th 459 (5th Cir. 2023), or *Vote.org v. Byrd*, No. 4:23-CV-111-AW-MAF, 2023 WL 7169095 (N.D. Fla. Oct. 30, 2023), for those courts' determinations that a wet signature requirement on a voter registration application is material in determining voter qualifications.

First, this case is distinguishable. Arkansas's wet signature rule is unsupported by any legislative judgment, *supra* Argument Section II.C.3, whereas the wet signature requirements at issue in *Callanen* and *Byrd* were each enacted by the state legislature. *See Callanen*, 89 F.4th at 468 (noting Texas's wet signature requirement was passed by the Texas Legislature and signed by the Governor); *Byrd*, 2023 WL 7169095, at *1 (describing Fla. Stat. § 97.053(5)(a)(8)). The fact that Texas's wet signature requirement was a legislative enactment was critical in *Callanen*, where the Fifth Circuit gave deference to the "state legislature's judgment" as to the utility of the wet signature requirement. *Callanen*, 89 F.4th at 489. Thus, if this Court were to follow *Callanen* (which it need not), "[a]mong the questions for [it] to answer [would be] the weight that should be given to the State's legislative judgment" as to the materiality of a wet signatures on a voter registration form. *Id.* at 480. The answer to that question here is clear: none whatsoever. The wet

signature rule was not enacted by the Arkansas Legislature and there is no mention of a wet signature requirement in the Arkansas Constitution or the election code. Moreover, the wet signature rule runs contrary to the Legislature's choice to require only a "signature or mark" from applicants, without any command as to what instrument must be used. *See supra* Argument Sections II.C.2–II.C.3. Accordingly, even assuming that *Callanen* was correctly decided, that decision *supports* finding that the wet signature is immaterial under Arkansas law.

Second, the reasoning in *Byrd* and *Callanen* was flawed, and this court need not (and should not) follow it. Both courts ignored the plain text of the Civil Rights Act, which requires that the challenged requirement be "material *in determining voter qualifications*" to conclude that an invented—and entirely amorphous—interest in solemnity was enough to justify state laws requiring wet signatures in connection with voting. 52 U.S.C. § 10101(a)(2)(B) (emphasis added). Based on this flawed reasoning, the district court in *Byrd* dismissed a challenge to a Florida law requiring prospective voters who have not provided an electronic signature to the Department of Highway Safety and Motor Vehicles ("DMV") to complete a paper registration application signed with their "original signature." 2023 WL 7169095, at *1. In doing so, the district court erroneously concluded at the pleading stage that—because a wet-ink signature purportedly "carries a solemn weight" that other types of signatures do not—it must be "material" for purposes of the materiality provision. *Id*. at *6. And the *Byrd* court further erred by failing to grapple with the fact that—as in Arkansas—Floridians who register to vote at the DMV may do so using an electronic signature, undercutting the idea that such signatures lack the necessary "solemnity" for voter registration. That court nowhere explained why the state of Florida had an interest in the "solemnity" of some prospective voters but not others.

Similarly, in *Callanen*, the Fifth Circuit concluded on summary judgment—again, with no supporting evidence in the record—that a Texas statute requiring individuals to sign their voter registration applications using their "original" or wet signature "fit within the strictures of the Materiality Provision" because "applying an original signature to a voter registration form carries 'solemn weight' that an imaged signature does not." *Callanen*, 89 F.4th at 489. Those courts' common conclusion is flawed because "solemnity" is not a qualification to vote, and the materiality provision's plain language does not authorize courts to invoke abstract state interests to justify the denial of a registration application for immaterial paperwork errors. *See supra* Argument Section II.C.4.

As applied here, the confused logic of *Byrd* and *Callanen* leads to the untenable conclusion that voters who register at ODS using an electronic signature filled out their applications in an insufficiently "solemn" manner, even though Arkansas law allows them to do so. *See supra* Argument Section II.C.2. The SBEC therefore has no basis to say that a wet signature is material in determining the voter qualifications of applicants who submit their applications in person or by mail to their county clerk's office.

## III. Absent relief, Plaintiffs will face continued and ongoing irreparable harm because of the wet signature rule.

"Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Cigna Corp. v. Bricker*, 103 F.4th 1336, 1346 (8th Cir. 2024) (quoting *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009)). Here, both the organizational Plaintiffs (GLA and VDO) and the individual Plaintiffs (Pastor and Loper) are suffering irreparable harm from the wet signature rule. The harms they face are "of such imminence that there is a clear and present need for equitable relief." *Id.* (quoting *H&R Block, Inc. v. Block, Inc.*, 58 F.4th 939, 951 (8th Cir. 2023)).

24

First, both GLA and VDO face irreparable harm because the wet signature rule directly forbids them from using their most effective tools for registering new voters in Arkansas, interfering with their core activities and undercutting their mission. *See* Dodge Decl., Ex. E at 6. Because of the wet signature rule, GLA has been forced to redesign its voter registration tool in a way that makes it far less effective. Foster Decl. ¶¶ 29–32. And VDO cannot activate the e-sign function for its Arkansas online tool at all. Hailey Decl. ¶¶ 9–10.

The wet signature rule also forces both GLA and VDO to expend resources in a manner that impairs their organizational missions. "Courts routinely recognize that organizations suffer irreparable harm when a defendant's conduct causes them to lose opportunities to conduct election-related activities, such as voter registration and education." *League of Women Voters of Mo. v. Ashcroft*, 336 F. Supp. 3d 998, 1005 (W.D. Mo. 2018) (collecting cases). Here, the wet signature rule imposes upon GLA the untenable choice of having to pare back its voter registration goals or, in order to maintain such goals, scale down its other civic engagement initiatives. Foster Decl. ¶¶ 31, 35–36. Similarly, VDO is prevented from employing its e-sign function for its Arkansas online tool, and it will be forced to rely on less effective means of assisting voters to register in the state. Hailey Decl. ¶ 10. The impact on both organizations comes at the expense of their activities aimed at encouraging and supporting voter participation in the upcoming 2024 elections, such as GOTV and voter assistance programs. Foster Decl. ¶¶ 33–34; Hailey Decl. ¶¶ 6, 10. "Such mobilization opportunities cannot be remedied once lost," *In re Georgia Senate Bill 202*, No. 1:21-CV-01259-JPB, 2023 WL 5334582, at *11 (N.D. Ga. Aug. 18, 2023) (quotation omitted), because "once the election occurs, there can be no do-over and no redress," *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014); *see also Emineth v. Jaeger*, 901 F.

Supp. 2d 1138, 1142 (D.N.D. 2012) ("Elections are, by nature, time sensitive and finite. While there will be other elections, no future election will be *this* election.").

Second, as to Pastor and Loper, there is no legal remedy that can compensate them for the loss of the opportunity to register with an electronic signature and subsequently vote in the 2024 elections. *See Fayetteville Pub. Libr. v. Crawford County*, 684 F. Supp. 3d 879, 910–11 (W.D. Ark. 2023). The right to vote is fundamental, and "[o]ther rights . . . are illusory if the right to vote is undermined." *Reynolds v. Sims*, 377 U.S. 533, 560 (1964). The materiality provision "protects the franchise of United States citizens [and] the failure to comply with that [statute] is an irreparable harm." *United States v. Georgia*, 892 F. Supp. 2d 1367, 1375 (N.D. Ga. 2012). Absent a preliminary injunction, Plaintiffs Pastor and Loper are irreparably deprived of a right guaranteed by the Civil Rights Act: to register and subsequently vote without denial of that right "because of an error or omission . . . [that] is not material in determining whether such individual is qualified . . . to vote." 52 U.S.C. § 10101(a)(2)(B); *see also League of Women Voters of N.C.*, 769 F.3d at 247 ("Courts routinely deem restrictions on fundamental voting rights irreparable injury."); *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) ("A restriction on the fundamental right to vote . . . constitutes irreparable injury."); *Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir. 1986) (same).

## IV.     The remaining equitable factors strongly favor granting a preliminary injunction.

"The balance-of-harms and public-interest factors 'merge when the Government'—or, in this case, a state official in [their] official capacity—'is the [nonmoving] party.'" *Eggers v. Evnen*, 48 F.4th 561, 564–65 (8th Cir. 2022) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

The balance of interests here favors granting a preliminary injunction. Most obviously, absent an injunction, Arkansas voters will be denied a right guaranteed by federal statute: to have otherwise legible and complete voter registration applications accepted by their county clerks

regardless of any immaterial errors or omissions. Likewise, the efforts of civic organizations like GLA and VDO to assist Arkansas voters to register to vote will be hampered by enforcement of the wet signature rule. Foster Decl. ¶¶ 20, 31, 35–36; Hailey Decl. ¶¶ 8–10. "[E]nsuring qualified voters exercise their right to vote," on the other hand, "is always in the public interest." *Ashcroft*, 336 F. Supp. 3d at 1006 (quoting *Action NC v. Strach*, 216 F. Supp. 3d 597, 648 (M.D.N.C. 2016)); *see also Brandt by & through Brandt v. Rutledge*, 47 F.4th 661, 672 (8th Cir. 2022); *D.M. by Bao Xiong v. Minn. State High Sch. League*, 917 F.3d 994, 1004 (8th Cir. 2019) ("The public is served by the preservation of constitutional rights." (quotation omitted)); *Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights."). Granting preliminary relief here also fulfills Congress's purpose in enacting the materiality provision. *See* 1964 U.S.C.C.A.N. at 2394.

In contrast, none of the Defendants will be harmed by an injunction. Indeed, it is hard to fathom how an injunction could impose any harm on Defendants when both the Secretary of State and Attorney General previously acknowledged that the use of electronic signatures is entirely consistent with Arkansas law. *See supra* Background Parts III–IV. The SBEC's only justification for the emergency rule was to provide uniformity and clarity to voter registration in Arkansas. Dodge Decl., Ex. E at 1–2. But, as explained, any lack of clarity here was *created* by the Secretary's sudden about-face on electronic signatures and Plaintiffs' requested injunction would ensure uniformity across Arkansas. *See supra* Argument Section II.C.4. Thus, the equitable factors unequivocally favor granting Plaintiffs' Motion for Preliminary Injunction.

## CONCLUSION

For the foregoing reasons, the Court should enter a preliminary injunction enjoining Defendants from enforcing the wet signature rule and from refusing to accept any voter registration application simply because it was signed with a digital or electronic signature.

Dated: July 11, 2024

Respectfully submitted,

*/s/ Uzoma N. Nkwonta*

**SHULTS LAW FIRM LLP**
Peter Shults (Ark. 2019021)
Amanda G. Orcutt (Ark. 2019102)
Steven Shults (Ark. 78139)
200 West Capitol Ave., Suite 1600
Little Rock, AR 72201
T: (501) 375-2301
F: (501) 375-6861
pshults@shultslaw.com
aorcutt@shultslaw.com
sshults@shultslaw.com

**ELIAS LAW GROUP LLP**
Uzoma N. Nkwonta* (DC 975323)
Christopher D. Dodge* (DC 90011587)
Omeed Alerasool* (DC 90006578)
Julie Zuckerbrod* (DC 1781133)
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
T: (202) 968-4490
F: (202) 968-4498
unkwonta@elias.law
cdodge@elias.law
oalerasool@elias.law
jzuckerbrod@elias.law

*Admitted *pro hac vice*

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served this 11th day of July, 2024, with a copy of this document via the Court's CM/ECF system.

*/s/ Uzoma N. Nkwonta*
Uzoma N. Nkwonta