**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION**


**GET LOUD ARKANSAS; VOTE.ORG;
NIKKI PASTOR; and TRINITY BLAKE LOPER**                              **PLAINTIFFS**


**V.**                                    **CASE NO. 5:24-CV-5121**


**JOHN THURSTON; SHARON BROOKS;
JAMIE CLEMMER; BILENDA HARRIS-RITTER;
WILLIAM LUTHER; JAMES HARMON SMITH, III;
and JONATHAN WILLIAMS, in their official
capacities as Commissioners of the Arkansas
State Board of Election Commissioners; BETSY
HARRELL, in her official capacity as Benton
County Clerk; BECKY LEWALLEN, in her official
capacity as Washington County Clerk; and
TERRI HOLLINGSWORTH, in her official capacity
as Pulaski County Clerk**                                    **DEFENDANTS**


**<u>MEMORANDUM OPINION AND ORDER</u>**

## TABLE OF CONTENTS

I.      INTRODUCTION _____ 3

II.     BACKGROUND _____ 6

   A.   Registering to Vote in Arkansas _____ 7

   B.   GLA and Vote.org's Online Tools_____ 8

   C.   The Wet Signature Rule _____ 12

      1.   The Implementation of the Rule_____ 12

      2.   The Rule_____ 13

      3.   Effect on GLA, Vote.org, and Individual Plaintiffs _____ 14

III.    PRIVATE RIGHT OF ACTION UNDER THE MATERIALITY PROVISION ____ 16

   A.   Step One: Congressional Intent to Create a Right_____ 18

   B.   Step Two: Rebuttable Presumption of Enforceability Under § 1983_____ 22

IV.     STANDING_____ 26

   A.   Organizational Standing of GLA _____ 27

      1.   Injury in Fact _____ 27

      2.   Causation and Redressability _____ 31

V.      PRELIMINARY INJUNCTION DISCUSSION_____ 32

   A.   Likelihood of Success on Merits _____ 33

      1.   Denial of the Right to Vote Based on an Error or Omission _____ 33

      2.   Material in Determining Whether Such Individual is Qualified to Vote___ 35

   B.   Likelihood of Irreparable Harm _____ 48

   C.   Balance of Equities and the Public Interest _____ 50

VI.     MOTIONS TO DISMISS _____ 51

VII.    CONCLUSION _____ 52

## I. INTRODUCTION

Plaintiffs challenge a rule promulgated by the Arkansas State Board of Election Commissioners ("SBEC") that requires voter registration applications in Arkansas to be signed with a handwritten, wet signature ("Wet Signature Rule" or "Rule").[1] Under the Rule, a voter registration application must include a "signature or mark" that consists of

> . . . a handwritten wet signature or handwritten wet mark made on a Registration Application Form with a pen or other writing device that is physically moved across the form and that forms the applicant's signature or mark on the paper form. A Signature or Mark that utilizes a computer to generate or recreate the applicant's signature or mark is not an acceptable signature or mark of the applicant . . . .

(Doc. 46-7, p. 63). However, this requirement is not imposed on all voter registration applications. For example, where a person registers to vote at a state agency, such as the Department of Motor Vehicles, no wet signature is required. But the Rule does bar individuals and third-party voter registration organizations from submitting voter registration applications with digital signatures. *Id.* at pp. 62–63.

Plaintiffs Get Loud Arkansas ("GLA") and Vote.org are nonprofit third-party voter registration organizations. GLA is an Arkansas-based organization founded in 2021 to address low voter registration and turnout in Arkansas. According to the U.S. Census Bureau, in 2020, only 62% of Arkansas citizens were registered to vote and only 54%

---

[1] At the time the suit was filed, the Rule had not formally been approved by the Legislative Council, but formal approval occurred on August 23, making the Rule permanent, effective on or around September 2. With leave of Court, Plaintiffs filed a Supplement (Doc. 63) to their Complaint on August 30 under Federal Rule of Civil Procedure 15(d) to acknowledge this development, and Defendants filed an Answer to the Supplement on September 6 (Doc. 70). In granting leave to file this Supplement, the Court made clear that it did not believe it necessary for relief considering the Plaintiffs' Complaint seeks relief against the Wet Signature Rule and "any other requirement that applicants sign their voter registration applications by hand or with a wet signature," thus encompassing the Wet Signature Rule—whether temporary or permanent. *See* Doc. 2, p. 24.

voted—the lowest rates nationwide. *See id.* at p. 5. GLA works to encourage and facilitate civic engagement by registering new voters; organizing get-out-the-vote campaigns; assisting voters in finding their polling location; identifying and helping voters who have been purged from Arkansas's voter rolls in reestablishing their registration status; monitoring and documenting changes to local election rules; along with other education and engagement campaigns. Vote.org is a nationwide 501(c)(3) nonprofit, nonpartisan voter registration and get-out-the-vote technology platform that works to simplify political engagement and increase voter turnout. Both GLA and Vote.org have developed tools that allow Arkansas voters to register online, which aim to increase the organizations' overall reach and efficacy. Plaintiffs Nikki Pastor and Trinity "Blake" Loper (together "Individual Plaintiffs") are Arkansans who applied to register to vote with the help of GLA and were rejected because their applications included digital signatures rather than wet signatures. There is no dispute that both Pastor and Loper are otherwise qualified to vote under Arkansas law.

Defendants John Thurston, Sharon Brooks, Jamie Clemmer, Bilenda Harris-Ritter, William Luther, James Harmon Smith, III, and Jonathan Williams serve on the SBEC. Specifically, John Thurston is the Arkansas Secretary of State ("Secretary") and the *ex officio* chairman of the SBEC, and the other individuals are Commissioners, all of whom are sued in their official capacities for implementing the Wet Signature Rule. Defendants Betsy Harrell, Becky Lewallen, and Terri Hollingsworth are the county clerks and permanent registrars for Benton County, Washington County, and Pulaski County, respectively. They are sued in their official capacities as the enforcers of the Rule.

4

Plaintiffs bring a singular claim: that the Wet Signature Rule violates the Materiality Provision of the Civil Rights Act of 1964 ("CRA"), now codified at 52 U.S.C. § 10101(a)(2)(B), which provides:

> No person acting under color of law shall . . . deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election[.]

The CRA was enacted "to protect and provide more effective means to enforce the civil rights of persons within the jurisdiction of the United States," including by reducing "obstacles to the exercise of the right to vote and provid[ing] means of expediting the vindication of that right." H.R. Rep. No. 88-914 (1963), *reprinted in* 1964 U.S.C.C.A.N. 2391, 2391, 2393.

The Materiality Provision of the CRA addresses the long history of county clerks rejecting Black Americans' registration applications "on the basis of purported 'errors' . . . that were hyper-technical, or entirely invented." Justin Levitt, *Resolving Election Error: The Dynamic Assessment of Materiality*, 54 Wm. & Mary L. Rev. 83, 148 (2012) (citations omitted). For example, applications were rejected for arbitrary mistakes like an applicant underlining "Mr." instead of circling it or misspelling his state as "Louiseana." *Id.* (citations omitted). Other applications were rejected because the applicant "identified [their] skin color as 'Negro' instead of 'brown' or 'brown' instead of 'Negro.'" *Id.* (citations omitted). In one of the more notorious examples, a woman's application was rejected "because the would-be registrant, required to account for her age in years, months, and days, missed the mark by one day because the day had not yet ended." *Id.* (citations omitted).

Plaintiffs seek declaratory and injunctive relief on the basis that the use of a digital signature—as opposed to a wet signature—is immaterial to determining whether an applicant is qualified to vote under Arkansas law and, thus, cannot serve as grounds for the rejection of a registration application. Defendants reject this and maintain that the Wet Signature Rule does not violate the Materiality Provision.

Now before the Court are Plaintiffs' Motion for Preliminary Injunction (Doc. 46) and Defendants Betsy Harrell and Terri Hollingsworth's Motions to Dismiss (Docs. 39 & 41). The Motions have been fully briefed and are ripe for review. On August 29, 2024, the Court held a hearing, at which the Court received oral argument on all three motions and ruled from the bench. For the reasons stated from the bench and herein, the Motion for Preliminary Injunction (Doc. 46) is **GRANTED**, and the Motions to Dismiss (Docs. 39 & 41) are **DENIED**. To the extent this written Order contradicts any of the Court's statements from the bench, this Order controls.

To roadmap, the Court will first provide background on the laws and facts at play. Then, the Court will address two threshold questions raised by Defendants: whether there is a private right of action under the Materiality Provision and whether Plaintiffs have standing. Lastly, the Court will address whether a preliminary injunction is proper.

## II.  BACKGROUND

Th[e] right to vote [is] . . . the foundation of our representative form of government. It is the sole means by which the principle of consent of the governed as the source of governmental authority is made a living thing.

H.R. Rep. No. 85-291 (1957), *reprinted in* 1957 U.S.C.C.A.N. 1966, 1977 (capitalization revised).

**A. Registering to Vote in Arkansas**

Under Arkansas law, any person may vote in an election provided they: (1) are a United States citizen; (2) are an Arkansas resident; (3) are at least eighteen years old; (4) are lawfully registered to vote; (5) have not been convicted of a felony; and (6) have not been adjudged mentally incompetent by a court. Ark. Const. art. 3, § 1(a)(1)–(4); *id.* amend. 51, § 11(a)(4), (5).

To vote, a person must first submit a registration application per the requirements of Amendment 51 to the Arkansas Constitution. *Id.* amend. 51, § 3. A person may register by submitting their application themselves, submitting through a third-party registration organization, or by registering at a state "Registration Agency," such as the DMV. *See id.* amend. 51, § 6(a)(2)(G) (contemplating submission by third-party registration organizations); *id.* amend. 51, § 5(a) (designating Registration Agencies).

Section 6 of Amendment 51 specifies certain requirements for *mail voter registration applications*—i.e., those submitted by individuals and third-party organizations—and certain requirements for applications submitted by Registration Agencies. Relevant here, both processes require the applicant to make a "signature or mark" on the application, affirming under penalty of perjury that the applicant meets the voter registration requirements. *Id.* amend. 51, §§ 6(a)(3)(F), (b)(1)(G), (b)(2).

The Arkansas Constitution does not define "signature or mark." And though Amendment 51 explicitly discusses the use of a "computer process" by Registration Agencies in registering new voters, the text makes no such mention regarding *mail voter registration applications*. *See id.* amend. 51 § 5(b)(2)–(4). However, section 6 explicitly

excludes "any requirement for notarization or other formal identification" or "authorization" for registration applications. *Id.* amend. 51, §§ 6(a)(5), (b)(2).

Under Amendment 51, county clerks serve as the permanent registrars and are tasked with processing registration applications. *See id.* amend. 51, §§ 2, 9(c). The Amendment instructs, "The permanent registrar shall register qualified applicants when a legible and complete voter registration application is received and acknowledged by the permanent registrar." *Id.* amend. 51, § 9(c)(1), (3).

Historically, county clerks in Arkansas have been "advised to accept voter registration applications with any type of signature or mark," including where "a person signs their name in an illegible fashion—or even just makes a mark." (Doc. 46-6, ¶ 16). While the signature or mark may be used for later comparisons against a voter's absentee ballot, *id.* at ¶ 19,[2] at the registration stage the signature or mark's "purpose . . . is to affirm under penalty of perjury that the information in the application is true and correct to the best of the applicant's knowledge." *Id.* at ¶ 16.

## B. GLA and Vote.org's Online Tools

In its early years, GLA relied on paper applications to register new voters, but it soon learned that this method—which required disseminating and tracking the physical applications—was resource-intensive and of limited efficacy. (Doc. 46-2, ¶ 9). Further, this method was not fully accessible to many Arkansans within GLA's target demographic,

---

[2] Even when comparing absentee ballot signature to registration signatures, Plaintiffs' evidence shows that county clerks often use PDF scans of the registration application or—where the voter registered through a Registration Agency—digital signatures. (Doc. 46-6, ¶¶ 18, 19). Counsel for Ms. Lewallen conceded at the hearing that "[i]n Washington County," the clerk uses "a scan of the paper copy" of the registration to make this comparison. (Doc. 64, pp. 70–71).

such as young people and those living in rural areas who "do not have the means to easily print and submit paper applications." *Id.*

To address these limitations, GLA developed an online tool in early 2023 that allowed applicants to fill out the registration application using a mobile device or computer. *Id.* at ¶¶ 10, 11. The first iteration of this tool allowed applicants to digitally fill out the information on the form promulgated by the Secretary, which GLA would then print and mail to the applicant for the applicant to hand-sign the application. *Id.* at ¶ 11. Then, the applicant could either mail the application to the appropriate county clerk themselves or send it back to GLA and authorize GLA to forward the application to the county clerk. *Id.* at ¶ 11. Though this process was more efficient than the paper-only method, it still posed accessibility issues for many voters and imposed financial and time costs on GLA. *Id.*

By mid-2023, GLA piloted an option to digitally sign the online form. *Id.* at ¶ 12. GLA then launched an entirely digital tool in January 2024. *Id.* at ¶ 13. This newest tool would allow all applicants to complete *and sign* the voter registration application digitally. *Id.* Like the 2023 tool, an applicant first fills out the information required by Amendment 51, which then populates the form created by the Secretary. *Id.* at ¶ 14. The applicant then uses either their finger, a stylus, or a mouse to digitally sign their name, under penalty of perjury, above a sworn statement as it appears on the Secretary's form. *Id.* Once the form is completed and signed, the applicant authorizes GLA to print and submit the form to the appropriate county clerk on the applicant's behalf. *Id.*

On February 5, 2024, GLA's Executive Director contacted the Secretary's office to confirm her understanding that Arkansas law does not require wet signatures on voter registration applications. *Id.* at p. 15. The Secretary's office promptly responded, stating

that its "attorneys looked into this last week and came to the same conclusion" that Arkansas law does not require a wet signature; the office noted "another concern," however, with the accuracy of a digital signature made with one's finger if it later needed to be compared against an absentee ballot. *Id.* at pp. 14–15. GLA's Deputy Director replied once again to clarify that "the registrations [that GLA] submit[s] right now are not going to be rejected based on the [use of a digital] signature," acknowledging that she understood the separate possibility of later issues when comparing signatures on absentee ballots. *Id.* at p. 14. The Secretary's office emailed back that while they could not "officially speak on the acceptance or rejection of applications"—which lies within the province of the county clerks—the office's "unofficial, non-attorney[ ] advice to the county clerks would be to err on the side of the voter and accept the registrations." *Id.* at p. 13.

One week later on February 12, GLA contacted the Secretary's office to ask if there were any differences between digital and wet signatures that they should take into account when registering potential voters. *Id.* at pp. 17–20. The Secretary's office responded: "While this is a sensitive issue that is not clear in the law, the Secretary of State does not see how a digital signature should be treated any differently than a wet signature. Again, this is a grey area in the law, so this should not be taken as an official legal opinion." *Id.* at p. 19.

GLA's fully online tool was a near-instant success, with the *Arkansas Times* reporting on February 26, 2024, that GLA had registered 358 voters using the new tool, 78% of whom were under twenty years old—GLA's target demographic. *Id.* at ¶ 15.[3] The

---

[3] *See also* Mary Hennigan, *Get Loud Arkansas Sees Success in New Voter Registration Strategy*, Ark. Times (Feb. 26, 2024), https://arktimes.com/news/2024/02/26/get-loud-

tool expanded GLA's capacity and success in reaching voters by making its "outreach efforts more cost-effective and scalable." *Id.* at ¶ 16. For example, where GLA would previously register five to ten students at a high school visit using paper applications, it was now able to register forty to sixty students per visit using the online tool. *Id.* at ¶ 17. GLA extended its reach beyond the fifteen counties it previously focused on and started registering voters in all seventy-five Arkansas counties. *Id.* at ¶ 18. The organization also noticed an exponential increase in the percentage of completed applications—from 33% when using the semi-online tool in 2023 to nearly 100% using the fully-online tool. *Id.* at ¶ 20. And, when compared to paper applications, the online applications were consistently more legible, *id.*, increasing the likelihood that they would be accepted and that all information would be accurately recorded by the clerk.

As to Vote.org, it has developed a digital signature function that it intends to launch in Arkansas like it has in various other states. (Doc. 46-3, ¶¶ 8, 9). Logistically distinct from GLA's digital signature tool, Vote.org's form has applicants upload an image of their original signature, which is then affixed to the form. *Id.* at ¶ 8. Once the signature is affixed, the applicant reviews the signed application, and Vote.org submits it to the appropriate county clerk thereby saving the applicant the time, trouble, and expense of printing and mailing the application. *Id.* Due to the Wet Signature Rule, Vote.org has yet to launch its digital signature function in Arkansas and continues to use an online tool that allows applicants to fill out the registration form but still requires the applicant to print, sign, and mail the application to the clerk. *Id.* at ¶ 7.[4]

---

arkansas-sees-success-in-new-voter-registration-strategy [https://perma.cc/5RT8-7QCP].

[4] Vote.org has operated in Arkansas through other means for many years, registering tens of thousands of Arkansans to vote between 2018 and 2022. *See* Doc. 46-3, ¶ 5.

## C.  The Wet Signature Rule

### 1.  Implementation of the Rule

On February 28, 2024—two days after the *Arkansas Times* reported on the success of GLA's online tool—Secretary Thurston sent notice to all county clerks in Arkansas, "strongly recommend[ing] that counties do not accept voter registration applications executed by electronic signature" and remarking on the need to "maintain [ ] strong election integrity." (Doc. 46-7, p. 17).

Soon after, on March 12, Secretary Thurston contacted Arkansas Attorney General Tim Griffin's office requesting a "formal opinion" on the legality of digital signatures on voter registration applications that are "created by a third-party non-governmental agency." *Id.* at p. 19; *see* Ark. Code Ann. § 7-4-101(g) ("The Attorney General shall provide legal assistance to the State Board of Election Commissioners in answering questions regarding election laws."). In April, Attorney General Griffin issued his formal opinion that "an electronic signature or mark is generally valid under Arkansas law," provided the "registration form [is] created and distributed by the Secretary of State." (Doc. 46-7, p. 21). In reaching this conclusion, Attorney General Griffin stated,

> given the historical acceptance of signatures produced through a variety of means, the widespread acceptance of electronic signatures, and the fact that Amendment 51 does not contain any restrictions on how a "signature or mark" may be made, I believe that an electronic signature satisfies Amendment 51's "signature or mark" requirement.

*Id.* at p. 23.

Disregarding the Attorney General's opinion, the SBEC swiftly adopted an emergency rule that prohibited county clerks from accepting voter registration applications with digital signatures from individuals and third-party organizations. *Id.* at

12

pp. 61–63, 66, 73; *see* Ark. Const. amend. 51, § 5(e) (authorizing and directing the SBEC to make rules that "are necessary to secure uniform and efficient procedures in the administration" of Amendment 51); Ark. Code Ann. § 7-4-101(f)(5) (similar). The emergency rule went into effect on May 4, a comment period was held mid-summer, and the Legislative Council approved the rule—thereby making it permanent—on August 23. *See* Doc. 63, ¶ 4 (Supplement to Complaint); Ark. Code Ann. § 10-3-309(c) (providing the process for the Legislative Council's approval of agency rules).

### 2. *The Rule*

In short, the Wet Signature Rule grafts SBEC-created definitions onto certain parts of Amendment 51 and alters the requirements for when a county clerk should accept a registration application.

Most pertinent here, the Rule narrows the definition of "signature or mark" only as applied to *mail voter registration applications*, but not as applied to Registration Agencies. (Doc. 46-7, pp. 62, 63).  Under the Rule,

> "Signature or Mark"—means a handwritten wet signature or handwritten wet mark made on a Registration Application Form with a pen or other writing device that is physically moved across the form and that forms the applicant's signature or mark on the paper form. A Signature or Mark that utilizes a computer to generate or recreate the applicant's signature or mark is not an acceptable signature or mark of the applicant for purposes of Amendment 51 §§ 6(a)(1) & (a)(3)(F) Registration Application Form.

*Id.* at p. 63. Notably, this definition of "signature or mark" does not apply to applications submitted by a Registration Agency under section 6(b)(1)(G).

Amendment 51 instructs that clerks "shall accept legible and complete voter registration applications." Ark. Const. amend. 51, § 9(c)(1), (3). While the Rule leaves this directive substantively untouched for applications submitted by Registration Agencies, it

slightly alters it as applied to *mail voter registration applications*, tacking on the requirement that the application be "executed with a Signature or Mark made by the voter registration applicant," as defined by the Rule, in order to be accepted. (Doc. 46-7, p. 63).

### 3. Effect on GLA, Vote.org, and Individual Plaintiffs

#### i. GLA and Vote.org

Without the ability to offer digital signatures, "the pace at which [GLA was] able to register new voters declined precipitously." (Doc. 46-2, ¶ 29). After the Rule went into effect on an emergency basis, GLA was "forced to fully disable [its] online voter registration tool." *Id.* While GLA eventually relaunched its online tool, it had to remove the digital signature feature, meaning applicants now were required to fill out the application online, print it out, apply a handwritten wet signature, and then mail or deliver the application to their county clerk without the help of GLA. *Id.* at ¶ 30. Rather than sending out texts or asking large groups to register simultaneously using the online tool at events, GLA has had to retrain and hire additional staff to attend public events and register people using paper applications. *Id.* at ¶¶ 19, 32. Additionally, the use of paper applications makes it far more difficult for GLA to track applicants' registration status "[b]ecause information on rejected applicants is only available at the county level and each county clerk tracks applicants differently," so "there is typically no way to tell whether an applicant's absence from the statewide voter file is because their application has been rejected or because it was never completed and submitted by the applicant." *Id.* at ¶ 32. By comparison, "[w]hen the online tool utilized electronic signatures, GLA could eliminate the latter scenario because [it] knew when applications were submitted to county clerks by GLA staff." *Id.*

This shift in resources has compromised GLA's ability to engage in its other activities, including organizing its get-out-the-vote campaign, *id.* at ¶ 33, assisting voters who have been purged from voter rolls to reestablish their registration status, and monitoring changes to local election rules. *Id.* at ¶ 34. These efforts have been nearly—if not entirely—abandoned by GLA in order to meet the demands of the Wet Signature Rule, making it all the more difficult for GLA to address the low voter registration rates in Arkansas. *See id.* at ¶¶ 33, 34.

As for Vote.org, it had invested significant resources to develop its own digital signature tool which it has implemented in many states. (Doc. 46-3, ¶¶ 8–9). However, due to the Wet Signature Rule, Vote.org is barred from deploying that tool in Arkansas, which has "impair[ed] the organization's ability to accomplish its mission" of registering Arkansans to vote, increasing the likelihood that Arkansas will continue to have the lowest registration rate in the nation. *Id.* at ¶¶ 9, 10. Without the digital signature function, voters will have to print and mail their own applications—short of Vote.org printing nearly-completed, unsigned applications and mailing them to applicants to be signed by hand—which will present an obstacle for the many applicants who do not have access to a printer. *See id.* at ¶¶ 7, 8, 10.

ii.  Individual Plaintiffs

Nikki Pastor registered to vote on February 24, 2024, using a QR code that GLA provided to her at a community event in Fayetteville, Arkansas. (Doc. 46-4, ¶¶ 7–9). Once Pastor returned home, she opened the saved link, completed and signed the form, and gave GLA approval to print and submit the application to the Washington County Clerk on her behalf. *Id.* Approximately one month later, Pastor's application was rejected by the

Washington County Clerk for having a digital signature. *Id.* at ¶ 11. Pastor remains unregistered to vote. *Id.* at ¶ 12.

Blake Loper received a link to the online tool from a GLA staff member and used it to update Loper's registration from Yell County to Pope County in December 2023, completing and signing the form digitally. (Doc. 46-5, ¶¶ 4–5). Like Pastor, Loper granted GLA permission to print and submit the application to the Pope County Clerk on Loper's behalf. *Id.* at ¶ 5. GLA submitted Loper's application on December 11, 2023; and, when Loper did not receive confirmation of the registration status, GLA resubmitted a copy of the application on May 1. *Id.* at ¶¶ 7–8. Then, on May 2, Loper received notice from the Pope County Clerk that the application had been rejected due to the digital signature. *Id.* at p. 4. Plaintiffs assert that Loper remains unregistered to vote.[5]

### III.   PRIVATE RIGHT OF ACTION UNDER THE MATERIALITY PROVISION

The SBEC contests whether the Materiality Provision creates a private right of action enforceable through § 1983. "To seek redress through § 1983, a plaintiff must assert the violation of a federal *right*, not merely a violation of federal *law*." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 282 (2002) (cleaned up). This requires a two-step process. At step one, the Court must determine whether Congress "unambiguously conferred federal individual rights." *See Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166,

---

[5] Plaintiffs' explains that Loper submitted a hand-signed application in early 2024, which appears to have been accepted, but Loper's last name was incorrectly entered into the voter registration record as "Lopez." (Doc. 46-5, ¶ 9). Plaintiffs' understanding is that Loper will not be able to vote until properly registered under the correct legal name. *See id.* at ¶ 10. The Court notes that, at oral arguments, Defendants contended that this misspelling will not prevent Loper from voting in November. (Doc. 64, pp. 47–48). It is not necessary to the Court's resolution of the pending motions to determine whether Loper will indeed be permitted to vote while the registration record reflects the name "Lopez."

172 (2023); *Gonzaga*, 536 U.S. at 283.[6] If Congress did intend to create such a right, then the plaintiff is afforded the rebuttable presumption that the statute is enforceable under § 1983. Accordingly, the second step assesses whether the defendants have rebutted the presumption.

Four circuits have spoken on this exact question: the Third, Fifth, and Eleventh Circuits have held that there is a private right of action under the Materiality Provision enforceable via § 1983, while the Sixth Circuit has held to the contrary. *Compare Migliori v. Cohen*, 36 F.4th 153 (3d Cir. 2022), *cert. granted, judgment vacated sub nom. Ritter v. Migliori*, 143 S. Ct. 297 (2022),[7] *and Vote.Org v. Callanen*, 89 F.4th 459 (5th Cir. 2023) [hereinafter *Callanen II*], *and Schwier v. Cox*, 340 F.3d 1284 (11th Cir. 2003) [hereinafter *Schwier I*], *with McKay v. Thompson*, 226 F.3d 752 (6th Cir. 2000). Additionally, Judge P.K. Holmes, III in this District has held in accord with the Third, Fifth, and Eleventh Circuits. *See League of Women Voters of Ark. v. Thurston*, 2021 WL 5312640, at *4 (W.D. Ark. Nov. 15, 2021).

---

[6] *Cf. Arkansas State Conf. NAACP v. Arkansas Bd. of Apportionment*, 86 F.4th 1204, 1208–09 (8th Cir. 2023). Though *Arkansas State Conference NAACP* was analyzing whether § 2 of the Voting Rights Act had an implied right of action—rather than a right enforceable under § 1983—*Gonzaga* made explicit that step one of the test is the same whether under § 1983 or under the statute itself. *Gonzaga*, 536 U.S. at 283.

[7] "The Supreme Court vacated *Migliori* and remanded to the Third Circuit with instructions to dismiss the case as moot. . . . One explanation for mootness is that after the Third Circuit ordered that the disputed ballots be counted, the election was certified. Then, essentially because plaintiffs had won, the Supreme Court vacated the Third Circuit's decision." *Callanen II*, 89 F.4th at 479 nn.6 & 7 (citations and quotation marks omitted). The Third Circuit remains consistent on this issue. *See Pennsylvania State Conf. of NAACP Branches v. Sec'y Commonwealth of Pa.*, 97 F.4th 120, 129 n.5 (3d Cir. 2024) (citing *Migliori*, 36 F.4th at 159–62 and *Callanen II*, 89 F.4th at 475–78) (assuming private plaintiffs can sue to enforce the Materiality Provision); *id.* at 140 n.3 (Shwartz, J., dissenting) (applying *Gonzaga* and *Talevski*).

In *McKay*, the Sixth Circuit stated, "Section 1971"—now 52 U.S.C. § 10101—"is enforceable by the Attorney General, not by private citizens." 226 F.3d at 756. The court, however, did not engage with the text of the statute or any binding precedent. As both the Fifth and Eleventh Circuits have described, the court in *McKay* "relied entirely" on two district court decisions, and "[n]either the Sixth Circuit nor these two district courts wrestled with the considerations for implying a private right." *Schwier I*, 340 F.3d at 1294; *Callanen II*, 89 F.4th at 478. This Court is not persuaded by *McKay*.

In contrast, the Third, Fifth, and Eleventh Circuits—each of which thoroughly engaged with *Gonzaga*, the statutory language, and the legislative history—concluded that the Materiality Provision does contain a private right of action enforceable through § 1983. *See Migliori*, 36 F.4th at 159; *Callanen II*, 89 F.4th at 478; *Schwier I*, 340 F.3d at 1297.

### A.  Step One: Congressional Intent to Create a Right

According to the Supreme Court:

> the *Gonzaga* test is satisfied where the provision in question is phrased in terms of the persons benefitted and contains rights-creating, individual centric language with an unmistakable focus on the benefited class. Conversely, we have rejected § 1983 enforceability where the statutory provision contained no rights-creating language; had an aggregate, not individual focus; and served primarily to direct the Federal Government's distribution of public funds.

*Talevski*, 599 U.S. at 183–84 (cleaned up); *see also Gonzaga*, 536 U.S. at 284, 287, 290. The Supreme Court's analyses in *Gonzaga* and *Talevski* are instructive here.

In *Gonzaga*, the Court held that the Family Education Rights and Privacy Act's ("FERPA") nondisclosure provisions did not provide a private right of action under § 1983 because they did not contain rights-creating language, had an aggregate focus, and

18

mostly served to direct the Secretary of Education's distribution of funds. 536 U.S. at 290. In so holding, the Court distinguished FERPA's nondisclosure provision from rights-creating statutes, such as Titles VI and IX. *Id.* at 284 & n.3, 287. While these statutes include "individually focused terminology," such as, "[n]o person . . . shall . . . be subjected to discrimination," FERPA's provisions "speak only to the Secretary of Education." *Id.* at 287 (quoting statutory language). The Court concluded that FERPA's language is "two steps removed from the interests of [the] individual," likening it to if Title IX had been written "simply as a ban on discriminatory conduct by recipients of federal funds or as a prohibition against the disbursement of public funds to educational institutions engaged in discriminatory practices." *Id.* (quoting *Cannon v. Univ. of Chi.*, 441 U.S. 677, 690–93 (1979)).

More recently, in *Talevski*, the Court analyzed two provisions of the Federal Nursing Home Reform Act ("FNHRA"), found at 42 U.S.C. § 1396r(c), under *Gonzaga* and held that the two provisions of the FNHRA unambiguously conferred private federal rights because they "use clear 'rights-creating language,' speak 'in terms of the persons benefited,' and have an 'unmistakable focus on the benefited class.'" 599 U.S. at 186 (quoting *Gonzaga*, 536 U.S. at 284, 287, 290). Looking to the specific language of the statute, one of the provisions "requires nursing homes to 'protect and promote *the right* to be free from [restraints that are] not required to treat *the resident's* medical symptoms.'" *Id.* at 184 (cleaned up) (quoting statutory language). The other provision, the Court noted, was "[n]estled in a paragraph concerning 'transfer and discharge *rights*.'" *Id.* at 184–85 (quoting statutory language). The Court further observed that even the exceptions to the provisions "sustain the focus on individual residents," using language like "to ensure the

physical *safety of the resident or other residents*" and by referencing "*the resident's welfare.*" *Id.* (quoting statutory language). Importantly, *Talevski* explained that, although there is some focus on the regulated party within the provisions, this is "not a material diversion from the necessary focus on the nursing-home residents," as "it would be strange to hold that a statutory provision fails to secure rights simply because it considers, alongside the rights bearers, the actors that might threaten those rights (and we have never so held)." *Id.* at 185.

Turning now to the question here: did Congress unambiguously intend to create a right within the Materiality Provision? This Court finds that it did.

The Materiality Provision itself states, "No person acting under color of law *shall* . . . deny the *right* of any *individual* to vote in any election because of an error or omission" that is "not material in determining whether such *individual* is qualified" to vote. 52 U.S.C. § 10101(a)(2)(B) (emphasis added). To start, "[t]his language is clearly analogous to the right-creating language [of Titles VI and IX] cited by the Supreme Court in *Gonzaga*." *Schwier I*, 340 F.3d at 1296; *see Callanen II*, 89 F.4th at 474 ("The phrasing of the Materiality Provision is similar to language the Court has held to confer a private right." (citing *Gonzaga*, 536 U.S. at 284 & n.3)). Further, the language creates a "mandatory rather than precatory" prohibition on denying a person the right to vote in violation of the Provision. *Schwier I*, 340 F.3d at 1290, 1297 (relying on *Blessing v. Freestone*, 520 U.S. 329, 340–41 (1997) for the proposition that "mandatory" language is more likely to evince an intent to establish a right). And despite the subject of the sentence being the person proscribed, "the focus of the text is nonetheless the protection of each individual's right to vote," which the statute clearly and specifically provides. *Id.* at 1296;

*Callanen II*, 89 F.4th at 474. No part of the Materiality Provision speaks of an "aggregate focus," "institutional policy," or the direction of government funds, making "the Materiality Provision's language [ ] decidedly more rights-focused than language the [Supreme] Court has held *not* to confer a private right." *Callanen II*, 89 F.4th at 474–75; *see Talevski*, 599 U.S. at 183–84; *Gonzaga*, 536 U.S. at 279; *see also Alexander v. Sandoval*, 532 U.S. 275, 289 (2001).

Admittedly, neither § 10101 nor the Materiality Provision itself focus exclusively on the rights-bearer; they also discuss the regulated parties. At first blush, this could create pause under Eighth Circuit precedent. *See Arkansas State Conf. NAACP v. Arkansas Bd. of Apportionment*, 86 F.4th 1204, 1210 (8th Cir. 2023) (analyzing § 2 of the Voting Rights Act and stating, "It is unclear what to do when a statute focuses on both [the benefitted and regulated parties]."). However, as the Fifth Circuit aptly notes, *Talevski* is right on point here: "[I]t would be strange to hold that a statutory provision fails to secure rights simply because it considers, alongside the rights bearers, the actors that might threaten those rights . . . ." *Talevski*, 599 U.S. at 185; *see also Callanen II*, 89 F.4th at 474–75. Under *Talevski*, this Court sees no problem with the fact that the Materiality Provision focuses both on the persons benefited and the persons regulated as it otherwise contains unambiguous rights-creating language.

The Materiality Provision does not exist in a vacuum but "must be read in [its] context and with a view to [its] place in the overall statutory scheme." *Talevski*, 599 U.S. at 184 (quoting *West Virginia v. EPA*, 597 U.S. 697, 721 (2022)). The surrounding provisions' focus on an individual's right to vote provides "framing" that is "indicative of an individual 'rights-creating' focus." *Id.* (citing *Gonzaga*, 536 U.S. at 284). Most notably, the

preceding provision states, "*All citizens* of the United States . . . *shall be entitled and allowed to vote* at all such elections . . . ." 52 U.S.C. § 10101(a)(1) (emphasis added). Subsection (a)(1) speaks in terms of the rights holder, granting a mandatory entitlement to vote in all elections. *See Callanen II*, 89 F.4th at 474 (describing subsection (a)(1) as bearing "strong 'rights-creating' language"); *Migliori*, 36 F.4th at 159 (agreeing that "the Materiality Provision unambiguously confers a personal right because it places all citizens qualified to vote at the center of its import and provides that they 'shall be entitled and allowed' to vote" (cleaned up)). Additionally, the statute itself characterizes subsection (a) as "secur[ing]" a "right" and "privilege," stating as much three times within § 10101. *See* 52 U.S.C. §§ 10101(c), (e). Lastly, these subsections—along with the Materiality Provision—all "reside" in § 10101, which is titled "Voting Rights." *See Talevski*, 599 U.S. at 184 (observing that both provisions "reside in 42 U.S.C. § 1397r(c), which expressly concerns 'requirements *relating to residents' rights*'" (cleaned up)).

Accordingly, the Court concludes that the Materiality Provision "unambiguously confer[s] federal individual rights" because it "use[s] clear 'rights-creating language,' speak[s] 'in terms of the persons benefited,' and ha[s] an 'unmistakable focus on the benefited class.'" *Talevski*, 599 U.S. at 172, 186 (quoting *Gonzaga*, 536 U.S. at 284, 287, 290). Thus, the Materiality Provision is presumptively enforceable under § 1983.

### B.  Step Two: Rebuttable Presumption of Enforceability Under § 1983

"Even if a statutory provision unambiguously secures rights, a defendant 'may defeat t[he] presumption by demonstrating that Congress did not intend' that § 1983 be available to enforce those rights." *Talevski*, 599 U.S. at 186 (alterations in original) (quoting *City of Rancho Palos Verdes, Cal. v. Abrams*, 544 U.S. 113, 120 (2005)). Put

differently, to rebut the presumption, one must "show[ ] that Congress specifically foreclosed a remedy under § 1983." *Gonzaga*, 536 U.S. at 284 n.4 (citations and quotation marks omitted). Such a prohibition may be explicitly contained within the statute, but "[a]bsent such a sign, a defendant must show that Congress issued the same command implicitly, by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983." *Talevski*, 599 U.S. at 186 (citations and quotation marks omitted). There is no language in § 10101 that "expressly forbid[s] § 1983's use," therefore the Court must look to whether the statute implicitly precludes bringing suit through § 1983. *Id.* The key inquiry, then, is whether a private right of action under § 1983 is *incompatible* with the enforcement scheme created by Congress. *Id.* (citing *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 252 (2009)). This "inquiry boils down to what Congress intended, as divined from text and context." *Id.* at 187.

The text may so indicate where a statute contains its own private remedy that is more restrictive than an action under § 1983 or provides for a "comprehensive remedial scheme" that is revealed—through statutory interpretative tools—to be incompatible with a § 1983 suit. *Id.* at 188–89. The Supreme Court has only found implicit preclusion in three cases. *Id.* at 189 (citing *Rancho Palos Verdes*, 544 U.S. at 120–23; *Smith v. Robinson*, 468 U.S. 992, 1008–13 (1984); and *Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 6–7 (1981)). And each of these cases "concerned statutes with self-contained enforcement schemes that included statute-specific rights of action" that "required plaintiffs to comply with particular procedures and/or to exhaust particular administrative remedies under the statute's enforcement scheme before suing

23

under its dedicated right of action." *Id.* (citations omitted). And each right "offered fewer benefits than those available under § 1983." *Id.* (citations omitted). Thus, the statutes in those three cases were "incompatible with individual enforcement under § 1983." *Id.* at 189–90 (citations omitted).

"Section 10101 lacks any specific 'private judicial right of action' or 'private federal administrative remedy' that requires plaintiffs to comply with particular procedures"—let alone one that offers fewer benefits than § 1983. *Callanen II*, 89 F.4th at 476 (quoting *Talevski*, 599 U.S. at 190). Therefore, "this exception to using Section 1983 is inapplicable." *Id.* Moreover, the statute's enforcement scheme, which grants enforcement authority to the United States Attorney General, *see* 52 U.S.C. §§ 10101(c)–(e), is not incompatible with a private right of action under § 1983. Rather, the legislative history shows that the Attorney General's enforcement power "augment[ed] the implied but established private right to sue." *Callanen II*, 89 F.4th at 476.

The most relevant history here revolves around the 1957 amendment to the Civil Rights Act. This amendment both granted the Attorney General enforcement authority— under what is now § 10101(c)—and "added what is now 52 U.S.C. § 10101(d), which provides that all actions brought 'pursuant to this section' can be exercised 'without regard to whether the party aggrieved shall have exhausted administrative or other remedies that may be provided by law.'" *Id.* at 475 (citing Civil Rights Act of 1957, Pub. L. No. 85-315 § 131, 71 Stat. 634, 637 (1957)). This supports a private right of action for two reasons.

First, the reference to the "party aggrieved" in subsection (d) very likely refers to private parties, not the Attorney General. *Callanen II*, 89 F.4th at 475; *Migliori*, 36 F.4th at

160 ("[T]his section specifically contemplates an aggrieved party (i.e., private plaintiff) bringing this type of claim in court."). This interpretation is supported by House Report 291, which recognized the long history of individuals using § 1983 to enforce the substantive rights of § 10101(a). *Schwier I*, 340 F.3d at 1295 (citing H.R. Rep. No. 85-291, *reprinted in* 1957 U.S.C.C.A.N. at 1977); *Callanen II*, 89 F.4th at 475–76 (citing the same and noting its reference to court opinions in which "exhaustion of remedies had been required for *private* plaintiffs"); *Migliori*, 36 F.4th at 162 ("When Congress added a provision for civil enforcement by the Attorney General, it acknowledged that private individuals had enforced the substantive rights in § 10101(a) via § 1983 for nearly a century."). Further, "the Committee first stated that the bill's purpose was 'to provide means of *further* securing and protecting the civil rights of persons within the jurisdiction of the United States,'" indicating that the addition of enforcement through the Attorney General was not intended to supplant already-existing avenues. *Schwier I*, 340 F.3d at 1295 (citing H.R. Rep. No. 85-291, *reprinted in* 1957 U.S.C.C.A.N. at 1966).

Second, Congress's removal of any exhaustion requirement for private plaintiffs in subsection (d) makes sense only if "there were a corresponding private right." *Callanen II*, 89 F.4th at 476 (citing *Schwier I*, 340 F.3d at 1296). Lastly, the Committee's "intense focus on protecting the right to vote" in House Report 291 would be inconsistent with the conclusion that "Congress meant merely to substitute one form of protection for another." *Schwier I*, 340 F.3d at 1295.

For these reasons, the Court finds that the Materiality Provision's presumptive enforcement found at Step One has not been rebutted at Step Two as the statute neither explicitly nor implicitly forecloses a private right of action under § 1983.

## IV.   STANDING

The SBEC challenges GLA and Vote.org's standing as organizations. And in her Motion to Dismiss, Benton County Clerk Betsy Harrell challenges Individual Plaintiffs' standing because neither of them attempted to register in Benton County, which is addressed *infra*. *See* Part VI. This Section addresses the organizational standing of GLA.

To establish Article III standing, a plaintiff must show that: (1) they have "suffered or likely will suffer an injury in fact"; (2) "the injury likely was caused or will be caused by the defendant"; and (3) "the injury likely would be redressed by the requested judicial relief." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024) [hereinafter *Alliance*] (citations omitted). Where multiple plaintiffs seek identical relief, only one plaintiff need satisfy Article III standing requirements. *Horne v. Flores*, 557 U.S. 433, 446–47 (2009). At the preliminary injunction stage, a plaintiff need only show that they are likely to have standing. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

An injury in fact must be (a) concrete and particularized, and (b) actual or imminent. *Alliance*, 602 U.S. at 381. A concrete injury is one that is "real and not abstract." *Id.* (citing *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021)). An injury is particularized when it affects the plaintiff personally and individually, rather than being a "generalized grievance." *Id.* (citing *Lujan*, 504 U.S. at 560). Further, an injury in fact must be actual or imminent, "not speculative—meaning that the injury must have already occurred or be likely to occur soon." *Id.* (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)). "[W]hen a plaintiff seeks prospective relief such as an injunction, the plaintiff must establish a sufficient likelihood of future injury." *Id.* (citing *Clapper*, 568 U.S. at 401). These requirements "screen[ ] out plaintiffs who might have only a general legal, moral,

ideological, or policy objection to a particular government action." *Id.* Generally, the injury-in-fact requirement will be easily met where a government regulation "require[s] or forbid[s] some action by the plaintiff." *Id.* at 382.

### A. Organizational Standing of GLA

To obtain preliminary injunctive relief at least one plaintiff must have standing. Organizations, like individuals, must establish the three constitutional requirements for standing. *Id.* at 393–94 (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982)). No matter how strong the organization's interest, it "must show 'far more than simply a setback to the organization's abstract social interests.'" *Id.* at 394 (first citing *Valley Forge Christian Coll. V. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 486 (1982), then quoting *Havens*, 455 U.S. at 379). As detailed below, the Court finds that GLA has established that it is likely to have standing as to all Defendants.

### 1. Injury in Fact

Where a defendant's actions "perceptibly impair[ ]" the plaintiff's "ability to provide [organizational] services," there is "no question that the organization has suffered injury in fact." *Havens*, 455 U.S. at 379. "Such concrete and demonstrable injury to the organization's activities—with a consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests." *Id.*; *see also Nat'l Fed'n of Blind of Mo. v. Cross*, 184 F.3d 973, 979 (8th Cir. 1999) ("Standing may be found when there is a concrete and demonstrable injury to an

organization's activities which drains its resources and is more than simply a setback to its abstract social interests." (citing *Havens*, 455 U.S. at 379).[8]

The Supreme Court recently clarified that "an organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action. An organization cannot manufacture its own standing in that way." *Alliance*, 602 U.S. at 394.[9] The Court made explicit that its decision in *Havens* did not stand for the "expansive" proposition that "standing exists when an organization diverts its resources in response to a defendant's action." *Id.* at 395. If that were the case, "all organizations in America would have standing to challenge almost every federal policy that they dislike, provided they spend a single dollar opposing those policies." *Id.* The Court factually distinguished *Alliance* and *Havens*, noting that the plaintiff in *Havens* was "not only [ ] an issue-advocacy organization, but also operated a housing counseling service" and when the defendant gave the plaintiff "false information about apartment availability" it "perceptibly impaired [the plaintiff's] ability to provide counseling and referral services" to their target demographic. *Id.* (quoting *Havens*, 455 U.S. at 379).

---

[8] *Cf. New York Ctr. for Foreign Pol'y Affs. v. U.S. Dep't of State*, 2024 WL 3400122, at *9 (D.D.C. July 12, 2024) (explaining the D.C. Circuit's two-step test for organizational standing: (1) that the organization's activities, not merely its mission, were impeded; and (2) that it used its resources to counteract that harm).

[9] In *Alliance*, an organization called the Alliance for Hippocratic Medicine challenged the FDA's approval of mifepristone. The organization asserted it had standing because it had expended time and resources in challenging the FDA's approval and on educating communities about mifepristone. 602 U.S. at 394.

GLA contends that the Wet Signature Rule *requires* third-party registration organizations to collect hand-written signatures and *prohibits* them from utilizing online digital signature technology, which severely limits their ability to register new voters. Indeed, the Wet Signature Rule and supplementary materials from the SBEC specify that applications submitted by third-party organizations must include a wet signature, whereas those submitted by Registration Agencies, such as the DMV, may include digital signatures. *See, e.g.*, Doc. 46-7, p. 72. It follows that, in implementing the Wet Signature Rule—from which Registration Agencies are essentially exempt—the SBEC was specifically targeting GLA's activity of registering voters through its online tool.[10] *See Callanen II*, 89 F.4th at 493 (Higginson, J., dissenting) ("The record contains a simple explanation for Texas's singular interest in a wet signature in the context of registration applications submitted by fax machine: Texas officials explicitly drafted [the requirement] to prevent the use of Vote.org's e-sign tool."). This is underscored here by the fact that the Secretary's about-face occurred two days after the *Arkansas Times* reported on GLA's success. (Doc. 46-2, ¶ 15; Doc. 46-7, p. 17).

The Rule's direct effect and interference with GLA's organizational activities has "perceptibly impaired" GLA's ability to provide voter registration services to Arkansans, as

---

[10] *See also* Doc. 46-7, p. 31 (identifying GLA as an organization that they expect pushback from); *id.* at p. 19 (Secretary writing Attorney General specifically seeking guidance on digital signatures used on applications by "a third-party non-governmental agency"); *id.* at p. 27 (the SBEC stating, "the Board is seeking to provide uniform processes for all county clerks, pending the adoption of a permanent rule regarding voter registration application processes and electronic signatures submitted *by third-party registration organizations*." (emphasis added)); *id.* at pp. 29–30 (noting the rule is meant to resolve conflict between clerks who are "accepting voter registration applications *from third-party organizations* that are signed by the applicant electronically" and those who are not (emphasis added)).

evidenced by the precipitous decline in registrations through GLA since the Rule was put into place. *See Havens*, 455 U.S. at 379; *Alliance*, 602 U.S. at 395; Doc. 46-2, ¶ 29. This has caused a "concrete and demonstrable injury to the organization's activities." *See Havens*, 455 U.S. at 379. GLA has also shown a "consequent drain on the organization's resources" because of the costs of complying with the Rule. *Id.* GLA has had to expend additional time, labor, and money in adapting to the new rule, including redesigning its tool and retraining and hiring additional staff to register people using paper applications. (Doc. 46-2, ¶ 32). It has also shown that these compliance costs have severely compromised its ability to engage in other organizational activities, such as assisting voters who have been purged from voter rolls and organizing campaigns. *Id.* at ¶¶ 33, 34. Put simply, GLA did not merely spend its way into standing—as the plaintiff in *Alliance* attempted to—rather it used its resources to comply with the Rule that proscribed the use of its digital signature tool, markedly limiting its ability to carry out its organizational activities.

GLA has shown a likelihood of more than an "indirect 'pocketbook' harm" from the Wet Signature Rule.[11] It has shown that it has likely suffered a concrete and particularized

---

[11] *Cf. Tennessee Conf. of the NAACP v. Lee*, 105 F.4th 888, 902–05 (6th Cir. 2024) (explaining that—in a case where an organization alleged harm based on a policy that made its voter registration efforts more costly but did not actually require or forbid any action of the organization—*Alliance* "creates uncertainty over when a plaintiff's own choice to spend money can give it standing to challenge a government action that allegedly caused the expenditure"); *North Carolina All. for Retired Ams. v. Hirsch*, 2024 WL 3507677, at *5 (E.D.N.C. July 19, 2024) (relying on *Alliance* in rejecting an organization's argument that it had standing to challenge a 30-day residency requirement on the basis that it "undermine[d]" the organization's "get-out-the-vote work" and "advocacy work" by "systematically preventing many of [its] members from voting . . . , making [it] less effective in furthering its mission" because the requirement did not "directly affect and interfere with [the organization's] ability to advocate issues of importance to [its

injury to its organizational activities through the requirements and proscriptions imposed by the Rule. *See League of Women Voters of Ohio v. LaRose*, 2024 WL 3495332, at *5 n.3 (N.D. Ohio July 22, 2024) (distinguishing *Alliance* from a case where a voting rights organization challenged an Ohio law that "forbid[ ] [organization] members from assisting disabled voters" because the injury was direct and not merely based on a diversion of funds). GLA has already been, and will continue to be, required to undertake certain actions by the Rule and forbidden to take others, thus the injury is actual. Under *Alliance*, where the regulation or law in question "require[s] or forbid[s] some action by the plaintiff," standing is "usually easy to establish." 602 U.S. at 382. Such is the case here.

### 2. *Causation and Redressability*

As the Court has found that GLA likely sustained an injury in fact due to the Rule, as discussed above, it reasonably follows that such injury was caused by the actions of the SBEC in enacting the Rule, will continue to be caused by the enforcement of the Rule by the county clerks, and could be remedied by this Court enjoining the Rule. Thus, causation and redressability are established. Therefore, it is likely that at least one plaintiff, GLA, has standing to sue as to all Defendants.[12]

---

target audience]," and there was no showing of activities, such as voter registration, beyond advocacy (cleaned up) (citations omitted)).

[12] Though the parties do not raise the issue of prudential standing, generally, litigants are "bar[red] . . . from asserting the rights or legal interests of others in order to obtain relief from injury to themselves." *Warth v. Seldin*, 422 U.S. 490, 509 (1975). This is referred to as third-party standing and has generally been termed a "prudential" consideration. There is currently no clear answer whether prudential standing is jurisdictional—like Article III standing—or, as its name would suggest, merely prudential.

In *Lucas v. Jerusalem Cafe*, LLC, the Eighth Circuit identified a circuit split on this question, noted that its own opinions had gone both ways, and reserved its decision on the issue for another day. 721 F.3d 927, 938–39 (8th Cir. 2013) (collecting cases).

## V.   PRELIMINARY INJUNCTION DISCUSSION

In determining whether to grant a motion for preliminary injunction, the Court must weigh the following four considerations: (1) the movant's likelihood of success on the merits; (2) the threat of irreparable harm to the moving party; (3) the balance between the harm to the movant if the injunction is denied and the harm to other party if the injunction is granted; and (4) the public interest. *Dataphase Sys., Inc. v. CL Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981). "While no single factor is determinative, the probability of success

---

However, not all the circuits involved in the identified circuit split were addressing third-party standing. For example, the D.C. Circuit—the singular circuit identified by *Lucas* to hold prudential standing was jurisdictional—was considering the "zone of interests," not third-party standing. *Grocery Mfrs. Ass'n v. E.P.A.*, 693 F.3d 169, 179 (D.C. Cir. 2012). This is a significant distinction because, just two years later, the Supreme Court held that labelling the "zone of interests" question "prudential" was a "misnomer," and it was, in fact, an Article III consideration. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 & n.3 (2014) (quoting *Ass'n of Battery Recyclers, Inc. v. E.P.A.*, 716 F.3d 667, 675–76 (D.C. Cir. 2013) (Silberman, J., concurring). Further, Judge Silberman's concurring opinion in *Association of Battery Recyclers*—quoted in *Lexmark*—acknowledged that third-party standing, as opposed to "zone of interests," "spring[s] from concepts of jurisdictional prudence" and "really is a judge-made concept." *See Ass'n of Battery Recyclers*, 716 F.3d at 675–77. Most recently, in *Carson v. Simon*, the Eighth Circuit discussed the *Lexmark* decision, and specifically noted that "the Supreme Court recognized the concept of third-party standing may still fit within the prudential standing analysis." 978 F.3d 1051, 1058 (8th Cir. 2020) (citing *Lexmark*, 572 U.S. at 127 n.3).

This Court believes that it is likely that third-party standing is truly a prudential—and not jurisdictional—issue. However, even if this Court were to conclude otherwise and address third-party standing *sua sponte*, it would still find that third-party standing is appropriate here because "enforcement of the challenged restriction *against the litigant*," i.e., GLA, "would result indirectly in the violation of third parties' rights." *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004) (quoting *Warth*, 422 U.S. at 510 and collecting cases). Due to the relationship between the parties, GLA's active participation in helping voters exercise their rights, and the fact that individual voters are also plaintiffs here, the traditional concerns with third-party standing—e.g., whether there is "concrete adverseness which sharpens the presentation of issues"—are not at issue. *NetChoice, LLC v. Griffin*, 2023 WL 5660155, at *10 (W.D. Ark. Aug. 31, 2023) (quoting *United States v. Windsor*, 570 U.S. 744, 760 (2013)).

factor is the most significant." *Kodiak Oil & Gas (USA) Inc. v. Burr*, 932 F.3d 1125, 1133 (8th Cir. 2019) (citations and quotation marks omitted).

## A.  Likelihood of Success on Merits

The SBEC argues Plaintiffs are unlikely to succeed on the merits because they cannot establish that requiring a wet signature is immaterial to determining a voter's qualifications under Arkansas law. Whether the Rule violates the Materiality Provision depends on whether its enforcement: (a) denies an individual the right to vote (b) based on an error or omission on a record or paper (c) that is immaterial in determining the individual's qualifications to vote. The Court will begin its analysis by discussing how the enforcement of the Rule constitutes a denial of the right to vote due to an error or omission.[13] The Court will then turn to the contested issue of whether such an error or omission is material in determining one's qualifications to vote under Arkansas law.

### 1.  Denial of the Right to Vote Based on an Error or Omission

In answering whether enforcement of the Rule constitutes a denial of the right to vote under the Materiality Provision, the Court starts with the statutory definition, which it must follow even if it differs from the term's usual meaning. *Van Buren v. United States*, 593 U.S. 374, 387 (2021) (citations omitted). Section 10101 explicitly defines "vote" as "all action necessary to make a vote effective including, but not limited to, registration." *See* 52 U.S.C. §§ 10101(a)(3)(A), (e). Therefore, interference with the voter registration process in violation of this Provision constitutes an impermissible denial of the right to

---

[13] Though Defendants do not challenge these elements head on, the SBEC does challenge irreparable harm, which dovetails with the denial of the right to vote, and argues that the Rule does not frustrate the registration process because people can still register through traditional methods (i.e., paper applications). (Doc. 53, pp. 11, 15–16).

vote. To suggest otherwise would—as Plaintiffs put it—"conflate the opportunity to register to vote in the abstract with the opportunity to register to vote consistent with the guarantees of federal law." (Doc. 58, p. 25).

Here, the SBEC intimates that the opportunity to resubmit in accordance with the Rule cures any statutory violation. But the "[d]enial of the statutory right to vote under Section 101 is complete when a particular application . . . is rejected"—"an opportunity to cure the rejection[ or] submit another application . . . does not negate the denial of the statutory right to vote." *La Unión del Pueblo Entero v. Abbott*, 705 F. Supp. 3d 725, 760 (W.D. Tex. 2023) [hereinafter *LUPE*] (citations omitted).

Moreover, the Court "doubt[s]" the "efficacy of an *ability* to cure" because "the *need* to cure an immaterial requirement creates a hurdle for—even if it is not itself a final denial of—the right to vote." *See Callanen II*, 89 F.4th at 487 (setting aside the motion panel's holding that the opportunity to resubmit cures the denial of the right to vote, leaving the issue open for another day, and noting that the court "do[es] not rely today on the fact alternatives exist if the initial registration fails"). Put more plainly, the opportunity to resubmit the application in compliance with the Rule does not negate the denial of the right to vote.

> Section 101 provides that state actors may not deny the right to vote based on errors or omissions that are not material; it does not say that state actors may initially deny the right to vote based on errors or omissions that are not material as long as they institute cure processes.

*La Unión del Pueblo Entero v. Abbott*, 604 F. Supp. 3d 512, 541 (W.D. Tex. 2022). If the only way an applicant can register is by complying with an immaterial requirement—and failure to do so will result in the applicant remaining unregistered—then the applicant is, by definition, being denied the statutory right to vote due to an error or omission that is

immaterial to determining their qualifications to vote under state law, in violation of the Materiality Provision. The Court finds it likely that enforcement of the Rule constitutes a denial of the right to vote based on an error or omission on a record or paper.

Further, the Rule indisputably involves an error or omission on a record or paper. It is simply common sense that a registration form would constitute a "record or paper relating to any application, registration, or other act requisite to voting." 52 U.S.C. § 10101(a)(2)(B); *see generally Schwier I*, 340 F.3d 1284 (applying Materiality Provision to registration forms). And from the Rule's requirement that the registration form include a wet, handwritten signature, it follows that the failure to include a wet signature (due to the inclusion of a digital signature) would constitute an omission.

### 2.  Material in Determining Whether Such Individual is Qualified to Vote[14]

i.   Defining "Material in Determining Whether Such Individual is Qualified Under State Law to Vote"

The Materiality Provision asks whether the error or omission is "material in determining whether such individual is qualified under State law to vote in such election." 52 U.S.C. § 10101(a)(2)(B) (emphasis added).

The first inquiry, then, is to define the meaning of "material." "[I]nterpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose

---

[14] Several of the SBEC's arguments center around the contention that "the Materiality Provision does not prohibit Arkansas from enacting rules important to safeguarding election integrity, as [the provision] does not displace state registration rules" that are permissible under Arkansas law. (Doc. 53, p. 11). The SBEC has not made any argument—let alone any persuasive argument—as to why the Materiality Provision, a federal statutory provision, should bow to state law. "Whether or not an administrative rule comports with the state constitution says nothing about its lawfulness under the Civil Rights Act—a federal statute." (Doc. 58, p. 14).

and context of the statute, and consulting any precedents or authorities that inform the analysis." *Sanzone v. Mercy Health*, 954 F.3d 1031, 1040 (8th Cir. 2020) (quoting *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006)). Courts should "depart from the ordinary meaning only if the words are otherwise defined in the statute itself, or if the context requires a different result." *Id.* at 1040–41 (citations and quotation marks omitted).

Here, the statute does not provide a definition, so the Court looks to the plain meaning. Black's Law Dictionary defines "material" as, "Of such a nature that knowledge of the item would affect a person's decision-making: significant; essential." *See Callanen II*, 89 F.4th at 478 (quoting Material, BLACK'S LAW DICTIONARY (8th ed. 2004)). Oxford English Dictionary offers a similar definition: "Of serious or substantial import; significant, important, of consequence." *Id.* (quoting Material, OXFORD ENGLISH DICTIONARY, III.6.a. (July 2023)). Like the Fifth Circuit in *Callanen II*, this Court does not see "essential" to be an appropriate meaning here, but it otherwise accepts these definitions as reasonable. *See id.* The plain meaning is further bolstered by the historical context and purpose of the statute. *See supra* Part I.

Next, "[t]o determine whether an error or omission is material, the information required"—here, a wet signature—"must be compared to state-law qualifications to vote," meaning "substantive voter attributes." *LUPE*, 705 F. Supp. 3d at 751 (citing, *inter alia*, *Migliori*, 36 F.4th at 162). Therefore, the question this Court must answer is whether the inclusion of a digital signature—and thus the omission of a wet signature—is of such

---

Contrary to the SBEC's assertions, the Materiality Provision *may* "prohibit Arkansas from enacting rules important to safeguarding election integrity," where those rules "deny the right of any individual to vote in any election because of an error or omission" that "is not material in determining whether such individual is qualified under State law to vote in such election." 52 U.S.C. § 10101(a)(2)(B) (emphasis added); s*ee also* Doc. 53, p. 11.

significance that it would affect the determination of whether the applicant seeking to register: (1) is a U.S. citizen; (2) is an Arkansas resident, (3) is 18 years or older; (4) has not been convicted of a felony; and (5) has not been adjudged mentally incompetent by a court.[15] Ark. Const. art. 3, § 1(a)(1)–(3); *id.* amend. 51, § 11(a)(4), (5); *see also Martin v. Haas*, 2018 Ark. 283, *2–3 (Ark. 2018).

### ii.   It is Unlikely the Use of a Wet Signature Aids in Determining a Voter's Substantive Qualifications

Defendants do not present argument or evidence as to how a wet signature—as compared to a digital signature—aids in determining whether a person is a U.S. citizen, is an Arkansas resident, is eighteen years or older, has a prior felony, or has been adjudged incompetent. To the extent Defendants argue that the wet signature helps confirm the identity of the applicant, thereby verifying the other qualifications, they present no argument or evidence as to why a wet signature better verifies a would-be registrant's identity than a digital signature or—more to the point—why the use of a wet signature (as

---

[15] A person must also be lawfully registered in order to vote. Ark. Const. art. 3, § 1(4). And the SBEC argues that, under the Arkansas Constitution, Arkansans can vote only if they are "registered in a manner provided for by [ ] Amendment [51]." (Doc. 53, p. 10 (citations omitted)). Courts routinely reject arguments that because something is made a requirement to vote or register, that it becomes material by the very nature of being required. *See, e.g.*, *Callanen II*, 89 F.4th at 487 ("We reject that States may circumvent the Materiality Provision by defining all manners of requirements, no matter how trivial, as being a qualification to vote and therefore 'material.'"); *cf. United States v. Mississippi*, 380 U.S. 128, 137–38 (1965) (concluding that the phrase "otherwise qualified by law" in § 10101(a)(1) means "qualifications required of all voters by valid state and federal laws"; including invalid laws would "dilute [Congress's] guarantee of the right to vote . . . by saying at the same time that a State was free to disqualify its [Black] citizens by laws which violated the United State Constitution.").

opposed to digital) is of such significance that it would affect the county officials' decision in whether someone is qualified.

In fact, the record evidence shows that the "wetness" of a signature does not affect county officials' determinations of qualifications at all, consistent with the Arkansas Constitution's prohibition of any notary or authentication requirement for applications. Historically, "Arkansas election officials have not considered the type of instrument used in signing or marking a voter registration application as a factor in determining whether the applicant is or is not qualified to vote in Arkansas." (Doc. 46-6, ¶ 15). Rather, county clerks "are advised to accept voter registrations with any type of signature or mark," including even illegible signatures or marks like an "x." *See id.* at ¶ 16. This is because, at the registration stage, the signature or mark serves as an attestation under penalty of perjury to the accuracy of the information provided, *id.*, rather than being used, for example, to verify a person's identity. Once registrations are received, all registration information "is entered into the same voter database," regardless of whether it was submitted with a digital signature through an agency like the DMV or with a handwritten signature by an individual or third-party organization. *Id.* at ¶ 18. Further, clerks are not "told or trained to remove any voter from the rolls or reject any voter-registration applicant because of the quality of signature or mark on a voter registration application or because of the type of instrument the person used to make a signature or mark." *Id.* at ¶ 20.

Based on the evidence and argument presented, the Court does not see how a county clerk would use the wetness of a signature to determine whether an applicant is qualified to vote under Arkansas law.[16]

---

[16] The Court would also briefly note that the superimposition of the Wet Signature Rule onto Amendment 51 requires a distorted interpretation of the Arkansas Constitution,

iii.  State Interests are Not a Relevant Consideration in Analyzing a
Violation Under the Materiality Provision

The SBEC and Defendant Lewallen, to some extent, assert that the SBEC enacted the Rule to ensure a uniform process and "further[ ] Arkansas's interest in preventing fraud, verifying voter identity and eligibility, and promoting the integrity of the voter registration process." Doc. 53, p. 11; *see also* Doc. 51, p. 2. However, the State's interest in the promulgation of the Wet Signature Rule is not a relevant consideration in evaluating whether requiring a wet signature violates the Materiality Provision.

"To the extent that [evidence of the SBEC's intent] bears on the wisdom of the [Wet Signature Rule], it is entirely irrelevant to the Court's analysis of Plaintiffs' Section 101 claims on the merits." *LUPE*, 725 F. Supp. 3d at 744. That is because "[u]nlike many other causes of action in the voting-rights context, the Materiality Provision is not a burden-interest balancing statute." *Id.* Violations of the Materiality Provision "are prohibited no matter their policy aim." *Id.* Though the Court recognizes that Arkansas "undoubtedly has an interest in deterring and preventing voter fraud, that interest must yield to a qualified voter's right" under the Materiality Provision. *Id.* at 745 (citing *Schwier v. Cox*, 412 F. Supp. 2d 1266, 1276 (N.D. Ga. 2005), *aff'd*, 439 F.3d 1285 (11th Cir. 2006) [hereinafter *Schwier II*]). "[T]he provision is clear that an 'error or omission is not material' unless it serves to 'determine whether such individual is qualified under State law to vote in such election.'" *Migliori*, 36 F.4th at 163 (cleaned up) (quoting 52 U.S.C. § 10101(a)(2)(B)).

To be sure, the SBEC's argument is not completely without merit. Indeed, they ask the Court to follow the Fifth Circuit's decision in *Callanen II*. Admittedly, *Callanen II* is the

---

making it even less reasonable that such a requirement serves any purpose in determining voter qualifications.

most on-point case as it analyzed whether a wet signature requirement in Texas violated the Materiality Provision. The court there held that it did not. In so holding, the court grafted consideration of state interests into its analysis of the Materiality Provision. For the reasons below, this Court rejects the Fifth Circuit's reasoning and, instead, agrees with *LUPE* and Judge Higginson's dissent in *Callanen II* that such considerations are not appropriate under the Materiality Provision.

Despite recognizing that the Materiality Provision "is not a constitutional claim necessitating the application of a balancing test," the court in *Callanen II* used Fourteenth Amendment caselaw to justify consideration of the state's interest in integrity when evaluating the materiality of the rule. 89 F.4th at 480–81. Specifically, the court looked to *Crawford v. Marion County Election Board*, 553 U.S. 181, 189–90 (2008) among other cases, to emphasize the "significance of a State's authority to set its electoral rules and the considerable deference to be given to election procedures so long as they do not constitute invidious discrimination." *Callanen II*, 89 F.4th at 481. The court then looked to various cases applying § 2 of the Voting Rights Act that incorporated the factors from *Thornburg v. Gingles* and determined that "whether the policy underlying" the wet signature requirement was "tenuous"—i.e., lacking a "strong connection between the policy and the requirement"—was "directly applicable in analyzing a State's justifications for the materiality of a practice." *Callanen II*, 89 F.4th at 483 (internal quotation marks omitted) (citing *Veasey v. Abbott*, 830 F.3d 216, 246 (5th Cir. 2016) (en banc)); *see also Gingles*, 478 U.S. 30, 37 (1986).

After a rather strained discussion, the Fifth Circuit landed on a rather strained test:

(1) how substantial is the State's interest in the requisite to voting in which some error or omission exists; (2) does that interest relate to determining

whether such individual is qualified under State law to vote in such election; and (3) under the totality of the circumstances, what is the strength of the connection between the State's interest and the measure, i.e., how well does the measure advance the interest?

*Callanen II*, 89 F.4th at 485 (cleaned up).[17] Later the court restated,

Our resolution comes down to whether requiring an original signature meaningfully, even if quite imperfectly, corresponds to the substantial State interest in assuring that those applying to vote are who they say they are. Is there a strong enough connection [between the rule or law and its justification] to overcome the possible denial of registration to some applicants?

*Id.* at 489.

It is unclear why the creation of such a test was necessary or appropriate where the statutory text of the Materiality Provision itself makes quite clear the relevant question: Is the error or omission material in determining whether an applicant is qualified to vote under state law? The Court does not find *Callanen II*'s "importation of *Crawford* and *Gingles* into the materiality context" persuasive and does not adopt it here.[18] *See id.* at 492 (Higginson, J., dissenting).

_____

[17] The Fifth Circuit adopted the totality of the circumstances from § 2 of the Voting Rights Act and the Supreme Court's holding in *Houston Lawyers' Association v. Attorney General of Texas*, 501 U.S. 419, 426 (1991), that a "State's interest in a voting measure 'is a legitimate factor to be considered by courts among the totality of the circumstances in determining whether a § 2 violation has occurred.'" *Callanen II*, 89 F.4th at 484 (cleaned up) (citing *Houston Lawyers'*, 501 U.S. at 426; 52 U.S.C. § 10301(b)).

[18] Simply because *Crawford* and *Gingles* were also vote-denial cases does not mean the tests used by the courts for constitutional challenges and challenges under a separate statute are proper. To borrow Judge Rodriguez's metaphor in *LUPE*: Though the Fourteenth Amendment, § 2 of the Voting Rights Act, and the Materiality Provision

may have been enacted to address a common problem, one should not limit the other where they "play different roles in achieving these broad, common goals." Indeed, as a matter of common sense, it is simply incorrect to assume that tools directed at the same goal must operate by the same means. Umbrellas, goloshes, and raincoats, for example, all work toward the same purpose—protection from the elements—but function in

41

As Judge Higginson aptly explained in his dissent, the Fifth Circuit had "previously recognized that *Crawford* 'only considered a First and Fourteenth Amendment challenge, which involves a different analytical framework than what we use for [statutory] claims.'" *Id.* at 492 (Higginson, J., dissenting) (alterations in original) (quoting *Veasey*, 830 F.3d at 249). Judge Higginson continued, "the Materiality Provision expressly limits states' purported 'considerable discretion,'" thus, "the 'considerable deference to be given to state election procedures' has no place in a materiality analysis." *Id.* (cleaned up) (quoting majority opinion). Further, Judge Higginson explained,

> The *Gingles* factors are used to help determine whether there is a sufficient causal link between the disparate burden imposed and social and historical conditions produced by discrimination. Unlike a section 2 claim, though— as the majority recognizes—a Materiality Provision claim need not allege any evidence of discrimination. More importantly, nothing in the Materiality Provision's text or existing case law requires plaintiffs to show a "disparate burden" on the right to vote; instead, plaintiffs need only demonstrate that the state's procedural requirement "is not material in determining whether" they are "qualified" to vote. Accordingly, reliance on the *Gingles* factors is inapposite in the materiality context.

*Id.* at 492 (Higginson, J., dissenting) (citations and quotation marks omitted).

Moreover, *Callanen II*'s test is not consistent with the history and purpose of the Materiality Provision. If courts allow voting restrictions because they are non-tenuously related to a legitimate state interest, this will negate the plain language of the Materiality Provision and belie the very purpose of the statute. For example, the state surely has a

---

completely different ways. To suggest that, because an umbrella works by "opening," we should likewise "open" our boots and coats in the face of a storm would be nonsensical and even—with respect to the raincoats— counterproductive.

*LUPE*, 725 F. Supp. 3d at 763 (quoting *Erlenbaugh v. United States*, 409 U.S. 239, 244– 45 (1972)).

strong interest in ensuring that voters are eighteen years or older, and this interest is related to determining whether someone is qualified to vote—indeed, it is a requirement to vote. A rule that requires voters to identify their age in years, months, and days would surely be non-tenuously related to that state interest. Under the Fifth Circuit's test, such a rule would likely pass muster. However, that is precisely the type of immaterial requirement that the Materiality Provision aimed to eliminate. Levitt, *Resolving Election Error: The Dynamic Assessment of Materiality*, 54 Wm. & Mary L. Rev. at 148.

Justice Alito's dissent in *Ritter v. Migliori* further calls the Fifth Circuit's reasoning on materiality into question. 142 S. Ct. 1824 (2022) (denying to stay *Migliori*, 36 F.4th 153 pending certiorari). In reaching its conclusion in *Callanen II*, the Fifth Circuit distinguished *Schwier II* and *Migliori*, stating, "[t]he immateriality of the omissions in those [cases] was fairly obvious," unlike in the case of the wet signature requirement. *Callanen II*, 89 F.4th at 480. In *Ritter*, however, Justice Alito—joined by Justice Thomas and Justice Gorsuch— offered a thorough explanation as to why he believed the Third Circuit in *Migliori* was "very likely wrong." *Ritter*, 142 S. Ct. at 1824 (Alito, J., dissenting). Justice Alito drew a distinction between regulations on the requisite acts of voting as compared to regulations on how ballots are cast, stating:

> Suppose a voter did not personally sign his or her ballot but instead instructed another person to complete the ballot and sign it using the standard notation employed when a letter is signed for someone else: "p. p. John or Jane Doe." Or suppose that a voter, for some reason, typed his or her name instead of signing it. Those violations would be material in determining whether a ballot should be counted, *but they would not be* "*material in determining whether such individual is qualified under State law to vote in such election*."

*Id.* at 1826 (Alito, J., dissenting) (emphasis added). This statement not only reflects Justice Alito's disagreement with the Fifth Circuit's statement that *Migliori* involved a "fairly

obvious" immaterial omission, it signals that at least three Justices would find that a defect in one's signature on a ballot, such as typing one's name, "would not be material in determining whether such individual is qualified under State law to vote in such election." *Id.* (internal quotation marks omitted). If typing one's name instead of signing it is not material to determining one's qualifications, it reasonably follows that the inclusion of a digital signature, rather than a wet signature, would not be material either.

Lastly, *Callanen II*'s deference to legislative action further distinguishes the case at bar because, unlike in *Callanen II* where the court was evaluating whether a *statute* passed via the legislative process was a violation of the Materiality Provision, here the Court is evaluating a *rule* promulgated by the seven-member SBEC.

The Fifth Circuit concluded: "Texas's justification that an original signature advances voter integrity is legitimate, is far more than tenuous, and, under the totality of the circumstances, makes such a signature a material requirement." *Callanen II*, 89 F.4th at 489. This Court believes the Fifth Circuit's consideration of state interests—based on a test cobbled together from constitutional and § 2 Voting Rights Act case law—strays too far from the plain, unambiguous language of the Materiality Provision. Accordingly, the Court declines to consider the state's interest in analyzing the Materiality Provision.[19] The Rule is likely immaterial to determining whether an individual is qualified to voter under Arkansas law and therefore violates the Materiality Provision; the SBEC cannot make an

---

[19] The Court is similarly skeptical of the district court's reasoning in *Vote.org v. Byrd*, 700 F. Supp. 3d 1047 (N.D. Fla. 2023), which relies almost entirely on the solemnity of a handwritten signature without much analysis, and certainly no analysis more in depth than what the Fifth Circuit provides in *Callanen II*.

immaterial rule material simply by claiming it satisfies some state interest, however noble the interest.

### iv. Even if the Court Took State Interests into Account, the Rule Likely Does Not Advance the Purported Interests

Assume, however, the Court accepted the Fifth Circuit's "importation of *Crawford* and *Gingles* into the materiality context, deference to [Arkansas's] election procedures" still "cannot save the wet-signature requirement." *See Callanen II*, 89 F.4th at 492 (Higginson, J., dissenting). The SBEC focuses on two primary interests to support the Rule: uniformity and integrity. But, according to the evidence presented by Plaintiffs, the Wet Signature Rule does not advance either of these interests.

The SBEC argues that it implemented the Rule to promote uniformity due to discrepancies in clerks' treatment of digital signatures in different counties. However, as noted, the Arkansas Constitution permits digital signatures from Registrations Agencies. The SBEC does not explain how implementing a rule that permits digital signatures in certain contexts and prohibits them in others promotes uniformity, particularly when uniformity could have been better achieved by permitting digital signatures in all contexts.

The SBEC states that "a uniform process furthers Arkansas's interest in preventing fraud, verifying voter identity and eligibility, and promoting the integrity of the voter registration process." (Doc. 53, p. 11). However, the SBEC does not provide an explanation as to how the Rule accomplishes these goals, other than making conclusory statements or relying on the idea that a wet signature is more "solemn" than a digital signature. *Id.* at pp. 11–12 (citing *Callanen II*, 89 F.4th at 489; *Vote.org v. Byrd*, 700 F. Supp. 3d 1047, 1056 (N.D. Fla. 2023)).

What the Court struggles to understand is how a handwritten "x" (i.e., a mark) would better protect against fraud than a signature made with a stylus on a tablet. As previously discussed, county clerks "are advised to accept voter registration applications with any type of signature or mark," regardless of legibility or whether the applicant in fact makes a mark rather than a signature. (Doc. 46-6, ¶ 16).

Even in the context of comparing registration signatures with absentee ballot signatures—which was the first, and originally only, concern expressed by the Secretary's office—there is evidence that it still does not make a difference to the clerks' ability to maintain election integrity. To start, "it is made clear to officials reviewing voter registrations for signature matches that they are not signature analysts, and they are taught to err on the side of the voter." *Id.* at ¶ 19.  Frequently, the comparable signature on the voter registration application will be a digital signature because many applications come from Registration Agencies like the DMV, meaning that clerks are already regularly comparing digital registration signatures to absentee ballot signatures. *Id.* Even where the application is submitted with a handwritten signature, clerks generally make the comparisons by "viewing PDF scans of the signatures," making it "very difficult to tell the difference between a signature made by pen," "a signature made by a stylus," "or a digital image of a handwritten signature that is then printed and submitted." *Id.* In other words, when a clerk is comparing registration signatures to absentee ballot signatures—the only moment identified in which registration signatures may affect election integrity—it is unlikely that a clerk would be able to distinguish between a wet signature, a signature submitted via GLA's tool, or a signature submitted through Vote.org's tool.

The SBEC does not explain why the use of digital signatures by third-party organizations threatens election integrity more than use by Registration Agencies. To be sure, the Court can see some common-sense reasoning that, at a location like the DMV, there is likely other confirmation of identity (perhaps the person is obtaining a license at the same time). But this practical distinction only extends to verifying identity. Further, the SBEC focuses more intently on the concept of "solemnity," relying on the holdings in *Callanen II* and *Byrd*. Even if this Court were to grant that "solemnity" is a legitimate interest that should be taken into account under the Materiality Provision—which this Court does *not* grant for the reasons stated in the preceding subsection—it would still fail to be persuasive in this case.

Importantly, in *Callanen II*, which *Byrd* heavily relied on, the Fifth Circuit's reliance on solemnity "hinge[d] on 'the effect on an applicant of seeing [certain] explanations and warnings above the signature block.'" *Callanen II*, 89 F.4th at 494 (Higginson, J., dissenting) (quoting majority opinion). Indeed, as Judge Higginson pointed out, the Fifth Circuit described Texas's argument on "solemnity" as "signing the form with the warnings in front of the applicant, threatening penalties for perjury and stating the needed qualifications," which had "some prospect of getting the attention of many applicants and dissuading false statements" in a way that "an electronic signature, *without these warnings*, d[id] not." *Id.* at 489. Not only does such reasoning show that "the wet signature itself" is not material in determining qualifications, *see id.* at 494 (Higginson, J., dissenting), it is distinct from the case at bar where a person digitally signing on GLA's

tool will see all the same warnings and perjury language that a person signing on a paper form would see. *See* Doc. 46-2, ¶ 14; Doc. 64, p. 82.[20]

"No evidence in the record supports—or even peripherally suggests—that the wet signature *itself* is material in determining whether a[n] [Arkansan] is qualified to vote." *Callanen II*, 89 F.4th at 494 (Higginson, J., dissenting). Arkansas "officials' admissions that they do not use the wet signature in any capacity to determine a voter's qualifications 'slams the door shut on any argument that [a wet signature] is material.'" *Id.* at 493 (Higginson, J., dissenting) (alterations in original) (quoting *Migliori*, 39 F.4th at 164). Thus, even if the Court were to take the state's interest in uniformity and integrity into account— which this Court explicitly rejects—the wetness of a signature would still be *factually* immaterial. *See id.* at 492–93 (Higginson, J., dissenting).

### B. Likelihood of Irreparable Harm[21]

"Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Cigna*

---

[20] The Court has further doubts as to the soundness of the solemnity reasoning. Digital signatures are widely recognized for all types of transactions and commitments. *See* Uniform Electronic Transaction Act ("UETA"), Ark. Code Ann. § 25-32-107(a) ("A record or signature may not be denied legal effect or enforceability solely because it is in electronic form."); Ark. Code Ann. § 25-32-107(d) ("If a law requires a signature, an electronic signature satisfies the law."). This is not to say the UETA applies to voter registration, but it demonstrates the State's acknowledgement of the legitimacy of digital signatures. *See also* Doc. 46-7, p. 23 (Attorney General Griffin noting the "widespread acceptance of electronic signatures").

[21] The SBEC made an argument that Plaintiffs could not show irreparable harm because the "emergency rule adopted by SBEC, which is the subject of this lawsuit, is on the verge of being superseded by a rule recently passed by SBEC, effective on September 1, 2024." (Doc. 53, p. 15 (citations omitted)). The Court disagrees with the SBEC on this point—as counsel for Ms. Harrell stated at the hearing, the rule doesn't "replace," but is "made permanent." Additionally, Plaintiffs brought this suit to enjoin any wet signature requirement, not merely the emergency rule. Nevertheless, out of an abundance of

*Corp. v. Bricker*, 103 F.4th 1336, 1346 (8th Cir. 2024) (citation omitted). Rather than merely showing a "possibility of irreparable harm," Plaintiffs "must show harm that is certain and great and of such imminence that there is a clear and present need for equitable relief." *Id.* (citations omitted).

Because the Wet Signature Rule likely results in the denial of the right to vote in violation of the Materiality Provision, voters in Arkansas—including Individual Plaintiffs— will suffer irreparable harm if a preliminary injunction is not granted.[22] *See League of Women Voters of N. Carolina v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) (citations omitted) ("Courts routinely deem restrictions on fundamental voting rights irreparable injury."); *LUPE*, 725 F. Supp. 3d at 765 (citations omitted) (same); *see Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) ("A restriction on the fundamental right to vote [ ] constitutes irreparable injury.").

As to the organizations, "[c]ourts routinely recognize that organizations suffer irreparable harm when a defendant's conduct causes them to lose opportunities to conduct election-related activities, such as voter registration and education." *League of Women Voters of Mo. v. Ashcroft*, 336 F. Supp. 3d 998, 1005 (W.D. Mo. 2018) (collecting cases). The election is less than two months away, and once it occurs "there can be no do-over and no redress." *League of Women Voters of N.C.*, 769 F.3d at 247; *see also In*

---

caution, the Court granted leave for the Plaintiffs to file a Rule 15(d) Supplement to their Complaint, which they filed on August 30, 2024, making clear that their pursuit of injunctive relief includes the now-permanent rule that was approved by the Legislative Council on August 23, 2024.

[22] The Court previously addressed the SBEC's argument on the opportunity to cure in its discussion on the denial of the right to vote. Though the Court does not repeat its reasoning as to why it is unpersuaded that resubmission in compliance with the Rule would cure the Materiality Provision violation, that reasoning applies here as well.

*re Georgia Senate Bill 202*, 2023 WL 5334582, at *11 (N.D. Ga. Aug. 18, 2023). ("Such mobilization opportunities cannot be remedied once lost." (citations and quotations marks omitted)). In addition, the organizations, and GLA in particular, have and will continue to incur compliance costs and suffer interference with their organizational activities.[23] Thus, absent a preliminary injunction, ongoing enforcement of the Rule, which has now been made permanent, will likely cause GLA and Vote.org irreparable harm.

Therefore, the Court finds the Plaintiffs have established a likelihood of irreparable harm absent a preliminary injunction.

### C. Balance of Equities and the Public Interest[24]

When the government opposes the issuance of a preliminary injunction, the final two factors—the balance of the equities and the public interest—merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). The balance of equities and public interest here decidedly favor Plaintiffs, given the likelihood that the Rule will deny voters in Arkansas

---

[23] Whether Vote.org will suffer irreparable harm is not as clear cut as GLA. In particular, the SBEC argues that harm to Vote.org is not imminent because it has not yet launched its online tool. The evidence shows, however, that Vote.org would have launched its tool in Arkansas—as it has done in various other states—but for the Wet Signature Rule and that the inability to do so has resulted in ongoing costs and resources.

[24] Though neither party briefed the *Purcell* principle, the Court notes its agreement with Plaintiffs' statement at the hearing that *Purcell* is "not some magic wand that bars Courts from issuing injunctions some amount of time out from an election." *See Purcell v. Gonzalez*, 549 U.S. 1 (2006); *cf. Brakebill v. Jaeger*, 905 F.3d 553, 560 (8th Cir. 2018) ("there is no universal rule that forbids a stay after Labor Day"). Indeed, *Purcell* is not at issue where, as here, the preliminary injunction "does not fundamentally alter the nature or rules of the election, create voter confusion, or create an incentive for voters to remain away from the polls," but rather it "*restores* and *maintains* the status quo that existed until" the SBEC's emergency rule. *Craig v. Simon*, 493 F. Supp. 3d 773, 789 (D. Minn.), *aff'd*, 980 F.3d 614 (8th Cir. 2020); *see also Carson v. Simon*, 978 F.3d 1051, 1062 (8th Cir. 2020) ("the same rationale that works to prevent election interference by federal courts also works to prevent interference by other entities as well"). Accordingly, *Purcell*'s concern with altering the election rules on the eve of an election is not at play here.

their statutory rights under federal law: to have otherwise legible and complete voter registration applications accepted by their county clerks regardless of any immaterial errors or omissions. *See League of Women Voters of Mo.*, 336 F. Supp. 3d at 1006 ("[E]nsuring qualified voters exercise their right to vote is always in the public interest." (citations and quotations omitted)). In contrast, granting the preliminary injunction will not cause any harm to Defendants—at most it will require them to accept registration applications with digital signature which they undisputedly already do. Accordingly, Plaintiffs' Motion for Preliminary Injunction (Doc. 46) is **GRANTED**.

## VI.   MOTIONS TO DISMISS

Lastly, the Court takes up the Motions to Dismiss by Defendants Harrell and Hollingsworth (Docs. 39 & 41). The Court finds that Plaintiffs have stated a plausible claim of relief as to both Harrell and Hollingsworth. Both Defendants are permanent registrars under Amendment 51, tasked with registering qualified applicants to vote and enforcing the Wet Signature Rule, making them proper Defendants to this action. *281 Care Comm. v. Arneson*, 638 F.3d 621, 631–32 (8th Cir. 2011); *Arkansas United v. Thurston*, 517 F. Supp. 3d 777, 785 (W.D. Ark. 2021) ("If an injunction against the county [officials] would provide at least partial redress to the alleged injury, it stands to reason that they are appropriate defendants for such a suit."); *see also* Ark. Const. amend. 51, §§ 2, 9(c); Doc. 46-7, p. 63. Further, Harrell's contention that the Individual Plaintiffs do not have standing against her is insufficient for dismissal, where, as here, the Court has already found that one party, GLA, has shown that it likely has standing as to all Defendants. *281 Care Comm.*, 638 F.3d at 631–32; *Horne*, 557 U.S. at 446–47 (where plaintiffs seek identical

relief, only one needs standing). Therefore, the Motions to Dismiss (Doc. 39 & 41) are **DENIED**.

### VII.   CONCLUSION

For the reasons explained herein, **IT IS ORDERED** that Plaintiffs' Motion for Preliminary Injunction (Doc. 46) be **GRANTED**, and Defendant Harrell and Defendant Hollingsworth's Motions to Dismiss (Docs. 39 & 41) be **DENIED**.

**IT IS FURTHER ORDERED** that Defendants, their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, be **PRELIMINARILY ENJOINED** from enforcing the Wet Signature Rule and from rejecting or refusing to accept any voter registration application on the ground that it was signed with a digital or electronic signature.

**IT IS SO ORDERED** on this 9th day of September, 2024.

                                          _____
                                          TIMOTHY L. BROOKS
                                          UNITED STATES DISTRICT JUDGE